**Phillip B. CHABOYA, Plaintiff,**

v.

**AMERICAN NATIONAL RED CROSS, a non-profit corporation; et al., Defendants.**

**No. CV 95–462–TUC–JMR.**

United States District Court, D. Arizona.

April 16, 1999.

Barry Martin Corey, Corey Farrell Kime & Bromiel PC, Tucson, AZ, for Phillip B. Chaboya, plaintiff.

Tom R Clark, Mesch Clark & Rothschild PC, Tucson, AZ, for American National Red Cross, defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROLL, District Judge.

Commencing December 8, 1998, a five-day court trial was held in this matter. Pursuant to Court order, the parties submitted proposed findings of fact and conclusions of law. Upon review of the entire record, judgment is entered for Plaintiff on his claim of hostile work environment and for Defendants on the claims of disparate treatment, wrongful discharge and retaliation. The Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The parties having stipulated to Facts A–UU in the Joint Pretrial Order, those facts are incorporated herein.

2. Plaintiff Phillip Chaboya is an Hispanic male and was employed by the American National Red Cross (Red Cross) from October 8, 1986 until December 10, 1993.

3. Plaintiff worked for the Red Cross as a Mobile Unit/Distribution Assistant from October 8, 1986 to October 15, 1987, and was promoted to the position of Senior Collection Assistant on October 16, 1987, a position which he held until December 10, 1993. As Senior Collection Assistant, Plaintiff's duties included driving the mobile units to and from collection sites for Red Cross blood drives. (Exhibits C and FF).

4. During the course of his employment with the Red Cross, Plaintiff received overall ratings of either "fully successful" or "good" on each of his performance evaluations and was considered by his supervisors and co-workers to be a good employee who was easy to get along with. Prior to his termination in December 1993, no disciplinary action had ever been taken by the Red Cross against Plaintiff. (Exhibit C; Testimony of Joseph Dockery, Diane Wangelin, Linnea Bass, Betsey Medearis, Anthony Mancini, Helen Louise O'Donnell and Margareta Jane Schneider).

## A. Plaintiff's Complaints of Discrimination

### Ban Against Speaking Spanish in Workplace

5. In 1990, Plaintiff was directed by his supervisor at the time, Rayma Fretwell, not to speak Spanish during work hours. Plaintiff was offended by this directive and made inquiry about this matter to the Civil Rights Division of the Office of the Arizona Attorney General. The Civil Rights Division advised Plaintiff that it was unlawful for the Red Cross to attempt to prevent

him from speaking Spanish on the job. Plaintiff also consulted a private attorney. Plaintiff thereafter discussed the matter with Joseph Dockery, the Principal Officer (Chief Executive Officer) of the Red Cross Blood Program. Dockery told Plaintiff that he would handle the situation. Dockery advised Fretwell that she did not have the authority to establish such a policy and that this was not a policy of the Red Cross. Neither Dockery nor any other Red Cross employee, however, subsequently informed Plaintiff that he had the right to speak Spanish in the workplace, although Plaintiff continued to do so based upon the information he had received from the Attorney General's office. Plaintiff testified that he was satisfied with Dockery's handling of the matter. (Testimony of Chaboya, Dockery and Wangelin).

### Racist Language by Co-Worker

6. On December 19, 1991, Plaintiff and Scott Creasy, a co-employee of the Red Cross, were involved in a verbal argument. Plaintiff reported the incident to one of his supervisors, Sandra McKee, the Director of Technical Services for the Southern Arizona Chapter of the Red Cross. Plaintiff informed McKee that Creasy had verbally accosted and physically threatened him. Specifically, Plaintiff told McKee that Creasy had called Plaintiff names such as "spic", "dumb Mexican" and "dumb-ass Mexican". Plaintiff also told McKee that Red Cross employee Sylvia Gibson had overheard the exchange. McKee directed Plaintiff to advise Dockery of the incident and told Plaintiff that Dockery would handle the matter. (Exhibits C, HH and II; Testimony of Chaboya, Dockery and Wangelin).

7. Plaintiff advised Dockery of the incident the next morning. Dockery told Plaintiff that he wished Plaintiff would have told him about the incident sooner and that he would determine a course of action after consulting with the Red Cross' attorney, Max Richards. Upon further investigation, the Red Cross determined that while two or three employees were aware that the argument between Plaintiff and

Creasy was taking place, no employee, including Gibson, had heard specifically what either party said or was able to confirm that Creasy had used racial slurs. Accordingly, the Red Cross took no action against Creasy. (Exhibits C, HH, and II; Testimony of Dockery).

8. Following Plaintiff's meeting with Dockery, neither Dockery nor any other Red Cross employee in 1991 or 1992 informed Plaintiff about the Red Cross' efforts to address Plaintiff's concerns about the December 19, 1991 incident.

### Alleged Threats Against Plaintiff by Co-Worker

9. On January 14, 1992, Plaintiff telephoned Dockery at home in the evening. Plaintiff told Dockery that he had learned that Creasy had asked fellow employees where he might purchase a gun. Plaintiff told Dockery that he was concerned about the matter in light of the fact that Creasy had threatened Plaintiff during the December 1991 incident. Dockery told Plaintiff that he would look into the matter but that he could not prevent Creasy from purchasing a weapon. (Exhibit HH; Testimony of Dockery and Chaboya).

10. On January 15, 1992, Dockery and Diane Wangelin, Director of Human Resources for the Southern Arizona Chapter of the Red Cross, met with Creasy regarding Plaintiff's allegations. Creasy denied calling Plaintiff racially offensive names and told Dockery and Wangelin that his interest in purchasing a gun was unrelated to Plaintiff. Dockery did not feel that he had sufficient facts or evidence to discipline or terminate Creasy at that time. Dockery, however, made it clear to Creasy that he was concerned about the incidents involving Plaintiff, that such behavior "better not be happening," and that if Dockery learned that it was, Creasy would be subject to termination. (Exhibit HH; Testimony of Dockery and Wangelin). However, Dockery never informed Plaintiff of the discussion Dockery had with Creasy. (Testimony of Dockery and Chaboya).

### Verbal Altercations with Co–Worker

11. On January 31, 1992, a second incident and argument occurred between Plaintiff and Creasy. Plaintiff did not report this incident to the Red Cross. His failure to do so may have been the result of not being informed by Dockery of the action taken by the Red Cross after Plaintiff's previous complaints.

12. On or about March 16, 1992, Plaintiff alleges that he had another argument with Creasy in the Red Cross lunch room. There were no witnesses to the argument. Although Dockery entered the lunch room at the end of the argument, he did not hear the argument. Additionally, Plaintiff's handwritten notes documenting the incident indicate that there were no racial slurs made during the argument. (Exhibit C).

### Complaint by Plaintiff

13. Sometime in May 1993, Plaintiff notified Dockery that he was disappointed with the manner in which Dockery had handled his prior complaints. Dockery apologized to Plaintiff for his lack of communication and indicated that he would try to keep Plaintiff better informed in the future. (Exhibit S).

### Defacing of Plaintiff's Photograph

14. On June 17, 1993, Chaboya informed Dockery and Wangelin that he had found a defaced photograph of himself and a co-worker, Luella Schcepke, posted on a work place bulletin board with the words "racist fagot" and "but why does he like white woman" written upon it. (Exhibit K; Testimony of Chaboya, Dockery and Wangelin).

15. The Red Cross investigated the defacement of the photograph and interviewed all personnel who had access to the area where the photograph was located. Dockery and Wangelin conducted the interviews and questioned employees as to whether they defaced the photograph or knew of anyone that was involved in the defacement of the photograph. (Exhibit S, Testimony of Dockery).

16. All employees indicated that they had no knowledge or information about who may have defaced the photograph. One employee, Leon Hagstrom, indicated that he had an idea about who defaced the photograph but that he "would not say." When asked further, Hagstrom responded that he had an opinion but no factual basis to support that opinion. Hagstrom was never asked for his opinion. (Exhibits M and N; Testimony of Chaboya, Dockery, Wangelin and Hagstrom).

### Remedial Action

17. On June 18, 1993, the Red Cross issued a memorandum to all employees. The memorandum stated in part: "Personal property of employees as well as that of the American Red Cross should not be defaced, mutilated or abused in any manner whatsoever. Such conduct will result in discipline up to and including termination.... This incident also requires that we remind all staff members that we will not tolerate sexual or racial harassment in the workplace. Violation of this policy will also subject employees to discipline up to and including termination." (Exhibit L). All employees, including Creasy, were required to review and initial the memorandum. (Exhibit L).

18. On June 18, 1993, Wangelin prepared a memorandum to Plaintiff's personnel file, in which she discussed the fact that, on that date, Plaintiff had reiterated to her the previous instances of racial harassment which he believed were directed at him and his dissatisfaction with the manner in which his complaints concerning those matters had been addressed by the Red Cross. (Exhibit O).

19. On June 28, 1993, Dockery and Wangelin met with Plaintiff. Dockery advised Plaintiff of the Red Cross's investigation of the defaced photograph. Plaintiff was also interviewed on that date regarding the defacement of the photograph. (Exhibits N and S).

20. Despite the investigation, the Red Cross was unable to determine who defaced the photograph.

### Plaintiff's Meetings with Red Cross Officials

21. At the June 28, 1993 meeting with Dockery and Wangelin, Plaintiff again expressed his dissatisfaction with the manner in which Dockery had addressed Plaintiff's previous complaints. Plaintiff asked to meet with a higher authority concerning these issues. Dockery indicated that Plaintiff could meet with Dr. Jerry Giordano, the Director of Medical Services for American Red Cross, or Beverly Downey, the Chairperson for the Red Cross Regional Blood Services Program. Wangelin and Dockery arranged for Plaintiff to meet with Downey, the Chairperson for the Red Cross Regional Blood Services Program. At a meeting with Downey in July 1993, Plaintiff voiced his concerns regarding the racial incidents and the Red Cross' handling of the incidents. (Exhibits S, T and U; Testimony of Dockery, Wangelin and Chaboya).

### Plaintiff's Medical Leave of Absence and Frey Letters

22. Due to the stress he was experiencing in the workplace, Plaintiff went on a medical leave of absence from mid-July to mid-September 1993, resulting in a loss of pay and/or benefits in the amount of $3,238.92. Plaintiff returned to work on September 14, 1993. (Exhibits C and Z; Testimony of Chaboya and Wangelin).

23. Sometime during his leave of absence, Plaintiff consulted with attorney Frank W. Frey. On October 7, 1993, Prey sent a letter to the Red Cross. Referring to Plaintiff's claims of race discrimination, the letter warned the Red Cross, "You have a problem. A big problem." The letter also stated, "Most distressing to [Plaintiff] is [the Red Cross'] lack of meaningful action." On October 20, 1993, Red Cross's attorney, Max Richards, responded to Frey's letter and indicated that the Red Cross had taken steps to address Plaintiff's complaints. On October 29, 1993, Frey sent a second letter to the Red Cross, which stated in part: "Perhaps, if the Red Cross had kept [Plaintiff] better informed, he would not be quite so frustrated." (Exhibit JJ). The Frey letters are further evidence that the Red Cross failed to inform Plaintiff of remedial action to address Plaintiff's complaints.

24. On October 20, 1993, Downey prepared a memorandum to Dockery in which she described her July 1993 meeting with Plaintiff concerning Plaintiff's dissatisfaction with the manner in which the Red Cross had addressed his concerns of racial harassment (Exhibit U).

### Plaintiff Again Meets with Red Cross Officials

25. Dockery found the letters from Frey to be "threatening" and testified that he had never received letters on behalf of any other employees which were even remotely similar to those received from Frey. In response to Frey's letters, Dockery and Wangelin met with Plaintiff on November 4, 1993. That meeting was recorded and transcribed by the Red Cross. (Exhibit X, Testimony of Dockery).

26. At the meeting, Dockery began by telling Plaintiff that the Red Cross had received the letters from Frey. Dockery then asked Plaintiff, "What do we need to do?" Plaintiff indicated that he believed that the letters were to be sent immediately following Plaintiff's leave of absence, sometime in mid-July. Instead, Plaintiff stated, "All of a sudden I'm back to work and the letters are just barely getting here." Dockery also noted that he had previously apologized to Plaintiff for Dockery's lack of communication with Plaintiff. Dockery stated that he wanted to be sure that any problems were resolved to Plaintiff's satisfaction. Plaintiff responded, "The past is past. I don't want to dwell on the past no more. It's over and done with. It's gone." When Dockery asked, "So where do we go from here?", Plaintiff responded that he "felt good," and was ready to start over "from day one." (Exhibit X).

27. After the November 4, 1993 meeting with Dockery and Wangelin, Plaintiff gave Dockery a copy of notes which Plaintiff had made and kept since December 1991. The notes were originally handwritten and later typed. The notes documented Plaintiff's incidents with Creasy and the defaced photograph. (Exhibit C; Testimony of Dockery and Chaboya).

## B. Plaintiff's Termination

### Blood Drive at University of Arizona

28. The Red Cross organized a blood drive at the University of Arizona campus, Tucson, Arizona for December 10, 1993. The blood drive was organized by Ann–Eve Cunningham and was among the Red Cross' largest annual blood drives. The University of Arizona mall is a one of the most public places in Tucson, Arizona, where numerous students and other members of the public gather.

29. It was very important for the Red Cross to maintain its excellent reputation and good will with the University of Arizona. The University of Arizona granted special permission to the Red Cross to bring its blood mobile to the University of Arizona mall for the purposes of blood donations, even though the University of Arizona is hesitant to allow organizations access to the mall and the roadway on the mall, which is normally closed to public traffic. The Red Cross had a good reputation for safety with its vehicles and blood mobile unit while on the University of Arizona premises.

30. On December 10, 1993, Plaintiff was in charge of driving the blood mobile unit to the University of Arizona campus for the purpose of the blood drive. That morning, Plaintiff drove the blood mobile unit, a Red Cross Bluebird bus with the Red Cross insignia on it, to the University of Arizona mall. Plaintiff was dressed in a Red Cross uniform. Riding in the bus with Plaintiff were Betsey Medearis and Anthony "Tony" Mancini, two fellow employees of the Red Cross.

### Plaintiff's Encounter with Student

31. Plaintiff was given access to the roadway on the mall of the University of Arizona and was traveling west down the mall roadway when he noticed a young man with a bicycle, at least part of which was on the right side of the roadway. The bicyclist's name is Dan Frayer. Frayer was a student at the university.

32. Medearis had essentially an unobstructed view looking through the front of the bus as the bus approached Frayer. Medearis testified, and the Court finds, that Plaintiff drove the bus unreasonably close to the student's bike. Although Medearis did not see the bus strike the bike, Frayer's girlfriend at the time of the incident, Bonnie Yeh, who was standing by Frayer at the scene, stated that she was "99% sure" that the bus actually came in contact with the bike. When Yeh gave her statement, she was no longer in a personal relationship with Frayer and her account of what had occurred was credible. The Court finds that the bus came in contact with the bike. (Exhibit U, at 2).

33. As the bus passed Frayer, Frayer hit the bus with his hand and was within a foot to a foot and a half of the bus as it went by.

34. Plaintiff contends that he was driving the bus down the roadway on the mall "very slowly" and as far to the left as possible, even crossing over the double yellow lines on his left to avoid hitting anyone or anything. Plaintiff also testified that a golf cart was located to the left side of the roadway, impeding his ability to move the bus further to the left, away from Frayer. Plaintiff later testified that the golf cart was stationary and not in the roadway but parked on the mall.

35. Medearis saw no golf cart on the roadway and it surprised her that Plaintiff made no attempt to turn or to slow down to avoid Frayer.

36. As the bus proceeded beyond Frayer, Plaintiff looked in his rear-view mirror at Frayer and said, "Come on, Come on!"

The bus eventually stopped in an area on the mall known as the "cactus garden." Frayer approached the open driver's side window of the bus and a verbal exchange took place between Frayer and Plaintiff, who was still sitting in the driver's seat.

37. Medearis testified, and the Court finds, that Plaintiff hurriedly exited the bus and approached Frayer at the front of the driver's side of the bus. A heated argument took place between Frayer and Plaintiff, with shouting on both sides. Plaintiff was agitated and waved his arms about. No actual physical contact occurred between Plaintiff and Frayer. Medearis also saw a mace-like canister in Frayer's hand during the confrontation between Plaintiff and Frayer.

38. Plaintiff and Frayer were standing within a few feet of each other. The confrontation was hostile. Frayer stated to Plaintiff, "Back off or you're going to get maced."

39. Cunningham testified and the Court finds, that as Plaintiff and Frayer were engaged in the confrontation, Plaintiff gestured toward Frayer in a physically threatening manner and Frayer moved back. Although none of the witnesses saw any physical contact or a physical fight, it appeared to both Cunningham and Medearis, and the Court finds, that the confrontation was on the verge of erupting into an actual physical fight.

40. During the confrontation between Plaintiff and Frayer, Mancini feared a fight would erupt. He exited the bus, came between Plaintiff and Frayer, and alleviated the confrontation.

41. In her statement to Plaintiff's investigator, Yeh stated that both Plaintiff and Frayer had used offensive language and had exchanged obscenities. (Exhibit PP and QQ).

42. In his statement to Plaintiff's investigator, Frayer stated that the bus struck the bicycle and that Plaintiff yelled at Frayer and exited the bus in a manner suggesting he was going to fight Frayer. Frayer felt that if the confrontation had not been alleviated by Mancini, a physical

fight would have ensued. Frayer indicated that he retrieved mace from his backpack for his own protection. (Exhibit UU).

### Plaintiff's Post–Confrontation Conduct

43. After the confrontation ended, Cunningham heard Plaintiff cursing in the area of the back passenger's side of the Red Cross Bluebird bus while numerous students were gathering in the area. Cunningham heard, and the Court finds, that Plaintiff was cursing loudly or using otherwise inappropriate language in close proximity to students and/or other members of the public.

44. Although Plaintiff contends that he simply exited the bus in order to activate the hydraulic lifters to stabilize the bus, that he had neither a confrontation nor a verbal argument with Frayer, and that Frayer never mentioned mace nor displayed any mace, the Court finds that Plaintiff conducted himself as described in paragraphs 36–44.

### Red Cross' Investigation of Incident

45. After Mancini intervened in the confrontation, Medearis and Cunningham discussed the incident with Frayer, who was polite to them. The Red Cross made arrangements to pay for the damage to Frayer's bicycle.

46. Before returning to the Red Cross station, Medearis and Cunningham spoke with Bass by telephone about the incident.

47. The incident with Frayer was of great concern to the Red Cross. The Red Cross feared being denied the opportunity to conduct the University of Arizona blood drive as a result of the incident and that its good will and relationship with the University of Arizona would be damaged. The Red Cross, however, did not lose its right to conduct future blood drives on the University of Arizona campus.

48. On December 10, 1993, Bass met with Medearis, Cunningham, and Mancini individually to discuss the incident be-

tween Plaintiff and Frayer. Bass met with these employees prior to interviewing Plaintiff. After discussing with them the major points of what had occurred between Plaintiff and Frayer, Bass requested that they prepare written reports of the incident.

49. During their meetings with Bass, Medearis, Cunningham, and Mancini each communicated to Bass that they were concerned about the incident and that they had not seen anything similar occur during their tenure with the Red Cross.

50. Because Bass was concerned with what had occurred on the University of Arizona campus, she interrupted Dockery in a meeting and briefly discussed the incident with him. Dockery instructed Bass to ascertain Plaintiff's version of the incident and to handle the matter as she saw fit. Bass understood this to mean that she had authority to do anything from taking no action at all to terminating Plaintiff. Dockery authorized Bass to do what she felt was appropriate up to and including termination. Bass had terminated other Red Cross employees in the past.

### Plaintiff's Meeting with Supervisor

51. Bass met with Plaintiff in her office in the late afternoon on December 10, 1993.

52. When Bass met with Plaintiff on the day of the incident, she was not told ahead of time by Dockery or anyone else what her actions should be, nor did she have any preconceived notion or desire to terminate Plaintiff, nor any plan or scheme to terminate Plaintiff.

53. During Bass' meeting with Plaintiff, she advised him what she had been told about the incident, which included, among other things, that Plaintiff left the bus and confronted Frayer, that a loud discussion ensued, and that Mancini intervened. During the meeting, Plaintiff's attitude was poor. Plaintiff became very agitated and claimed that a golf cart was approaching the bus going east and that he had given as much right-of-way as possible to Frayer. Plaintiff claimed that Frayer

cursed at him and Plaintiff stated, "Nobody gets away with that." Bass explained to Plaintiff that it was wrong to take the incident personally and that Plaintiff should not have "continued the confrontation." Plaintiff asserted that his "reputation was at stake" and that he did not give a "damn" if he was in a Red Cross uniform or not. Although Plaintiff denied hitting the bike, he offered to pay for the bike. (Exhibit H, Testimony of Bass).

54. During his conversation with Bass, Plaintiff was not apologetic, felt that he did absolutely nothing wrong, did not feel that he overreacted, and gave Bass the clear impression that under the same circumstances he would behave the same way again. Plaintiff stated that he could not say he was sorry for what happened and that he thought Bass would have done the same thing. Finally, Plaintiff stated that he "could sit there and say it would not happen again, but he could not guarantee it," or words to that effect. (Exhibit H).

55. During Plaintiff's testimony, he was questioned concerning his statement to Bass. Plaintiff indicated that no one could predict how he or she would react in a situation similar to that which occurred on the University of Arizona campus. (Testimony of Chaboya).

56. After Bass terminated him on December 10, 1993, Plaintiff congratulated her for making a decision and said that he understood what she had to do. (Exhibit H). Bass thereafter prepared a memorandum of the meeting. (Exhibit G).

### Plaintiff's Lodging of Civil Rights Complaint

57. After he was terminated, Plaintiff filed a charge of discrimination with the Arizona Civil Rights Division and the Equal Employment Opportunity Commission (EEOC). (Exhibit EE). The complaint alleged racial discrimination as evidenced by (1) a supervisor's directive to Plaintiff to not speak Spanish on the job, (2) an Anglo co-worker's ethnic slurs and derogatory comments directed to Plaintiff,

(3) a defaced photograph of Plaintiff and a co-worker posted on a Red Cross employee bulletin board, and (4) Plaintiff's termination on December 10, 1993. Plaintiff claimed that he did not hit Frayer's bicycle nor was he involved in an argument with Frayer on December 10, 1993. Plaintiff alleged that he was treated differently than other Anglo workers similarly situated at the Red Cross. Plaintiff also claimed that his termination was pretextual and that he was terminated in retaliation for his complaints of discrimination. (Exhibit EE).

58. The Arizona Civil Rights Division investigated Plaintiff's allegations and interviewed witnesses. An investigator was assigned to the case under the authority of James Burchell of the Arizona Civil Rights Division. On January 31, 1997, the Arizona Civil Rights Division issued a "no cause" order, finding that there was "not 'reasonable cause to believe' " that the Red Cross had discriminated against Plaintiff. (Exhibit Y).

59. In reviewing the Arizona Civil Rights Division's findings, the EEOC determined that the evidence did not establish a violation of Title VII. (Exhibit MM).

### Further Findings of Fact re Bike Incident and Post–Incident Interview

60. Having considered the testimony as a whole, the Court finds that Plaintiff's testimony regarding the December 10, 1993 incident on the University of Arizona mall is not accurate and/or not credible.

61. The Court finds that Plaintiff's actions on December 10, 1993 on the University of Arizona campus consisted of a heated verbal confrontation with Frayer.

62. At the time of Plaintiff's termination, he was an "at will" employee and could be terminated with no advance notice for (1) misconduct, (2) violating Red Cross regulations, (3) violating civil laws, or (4) unsatisfactory work performance. (Exhibit A, at 3).

63. At the time of Plaintiff's termination, the Red Cross had no formal progressive discipline policy but handled each matter on a case by case basis as deemed appropriate.

64. At the time of Plaintiff's termination, the Red Cross had in place a "code of conduct" applicable to Plaintiff, which prohibited Plaintiff from engaging in any conduct that did not serve the best interest of the Red Cross. (Exhibit A, at 18).

65. Plaintiff was trained by the Red Cross in its "Service of Excellence" course and completed the course training on March 29, 1993. Plaintiff was trained, among other things, that a "customer" is any person the Red Cross staff comes into contact with, either internally or externally, while representing the Red Cross. Further, Plaintiff was taught that a customer "is not someone to argue with and that there is no way to win a fight with a customer." (Exhibit B, at 2–2).

66. Plaintiff's conduct on December 10, 1993 at the University of Arizona mall violated the Red Cross's code of conduct and the training given to Plaintiff in the Service of Excellence Manual. Frayer was a customer and a potential blood donor.

67. The Court finds that Dockery authorized Bass, after consulting with Plaintiff, to take appropriate action with respect to the incident involving Plaintiff on the University of Arizona mall, up to and including termination of Plaintiff.

68. The Court finds that Plaintiff's termination was not in violation of the Red Cross' Personnel Policies and Practices Handbook.

69. The Court finds that the Red Cross adequately investigated the events at the University of Arizona mall before taking action.

70. The Court finds that Bass terminated Plaintiff for a number of permissible reasons, including plaintiff's causing the bus to strike Frayer's bike at the University of Arizona mall, Plaintiff's heated confrontation with Frayer at the mall, Plaintiff's lack of remorse in his interview with

Bass, as well as his statements at the interview that he did not give a damn about the Red Cross uniform, that he was not sorry for the incident, and that he could not guarantee that a similar incident would not occur in the future.

## C. Plaintiff's Claims of Disparate Treatment

71. The Red Cross terminated numerous employees from 1986 to 1996. (Exhibit BB). Although each of those terminations occurred after multiple incidents, none are comparable to Plaintiff's confrontation with Frayer and his lack of remorse thereafter.

### *Personnel Action Involving Other Employees*

72. Joyce Early, a Caucasian female, was terminated by the Red Cross on December 6, 1993. Early was not adept at puncturing veins or drawing blood. Donors felt uncomfortable around Early and she caused bruising on some donors. Often, Early had to make numerous adjustments in selecting and puncturing veins, and one donor claimed that Early was "indifferent" towards her. On one occasion, Early shouted in the presence of donors: "Contaminated!" Eventually, Bass terminated her. Bass testified, and the Court finds, that these incidents and Early's termination were not comparable to the incident involving Plaintiff on the University of Arizona mall on December 10, 1993, or to the circumstances surrounding Plaintiff's termination.

73. Hagstrom, a Caucasian male, was employed by the Red Cross at the time of Plaintiff's hiring. Hagstrom was familiar with Plaintiff and considered himself a personal friend of Plaintiff. Hagstrom was involved in an incident at a blood drive in San Manuel during which he had a disagreement with a volunteer worker. Apparently, after offending the volunteer, Hagstrom did not enter a heated argument or confrontation with the volunteer, but simply walked out of the building where the blood drive was conducted. Hagstrom thereafter avoided the volunteer worker

and apologized to the Red Cross for the incident. Hagstrom said that he would try not to allow a similar incident to occur again. The Court finds that the incident involving Hagstrom is not comparable to the incident involving Plaintiff on the University of Arizona mall on December 10, 1993.

74. Ragstrom was also involved in an incident during a blood drive at Hughes Aircraft. When a volunteer noted that the Christian Power Weight Lifting Team was in Tucson and should give blood, Hagstrom commented in front of donors and volunteers that it was potentially unwise for the Christian Power Team to donate blood. This statement apparently upset certain donors at Hughes Aircraft. Hagstrom testified that he was uncertain whether he apologized to the offended donors. The Court finds that the incident is not comparable to the incident involving Plaintiff on the University of Arizona mall on December 10, 1993.

75. Hagstrom was also involved in an incident during a blood drive at the Pima County Sheriff's Department. Hagstrom made a comment about the militia, thereby offending a Pima County Sheriff's deputy. Hagstrom immediately apologized to the officer, and later to the Red Cross, for the incident. Hagstrom advised the Red Cross that he would not permit this type of thing happen again. The Court finds that the incident with the Pima County Sheriff's Office is not comparable to the incident involving Plaintiff on the University of Arizona mall on December 10, 1993.

76. Hagstrom was interviewed by the Arizona Civil Rights Division on March 12, 1996. When asked by investigators how he would have responded to his supervisor, Bass, if he had been involved in an incident similar to that involving Plaintiff on December 10, 1993, Hagstrom replied that he would have informed Bass that he would try his best not to allow it to happen again. When asked by the investigator what Hagstrom thought would have happened to him had he told Bass, "I can't guarantee

you that it won't happen again," Hagstrom replied that he "probably wouldn't be employed [at the Red Cross]." (Testimony of Hagstrom).

## CONCLUSIONS OF LAW

### A. Discrimination/Hostile Work Environment

■ 1. In order to prevail on a racially hostile work environment claim, Plaintiff must establish that (a) he belongs to a protected group, (b) he was subjected to unwelcome harassment based upon his race, (c) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (d) the employer knew or should have known of the alleged harassment and failed to take adequate remedial action. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998).

■ 2. Remedial action must be prompt and "reasonably calculated to end the harassment." *See Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir.1991).

■ 3. The directive given to Plaintiff that he not speak Spanish on the job, the racial epithets and other conduct directed at Plaintiff by Creasy, and the defacement of the photograph of Plaintiff and Schoepke, created a racially hostile work environment for Plaintiff.

4. The Red Cross was aware that Plaintiff was experiencing racially hostile conduct. Plaintiff complained to the Red Cross about the incidents described in paragraph 3, Conclusions of Law, *supra*.

5. A hostile work environment persisted in spite of the Red Cross' efforts to address Plaintiff's complaints because Plaintiff continued to experience racially

hostile conduct even after complaining to supervisors. Most importantly, Plaintiff failed to advise Plaintiff of remedial action taken by the Red Cross to address these matters.

6. Accordingly, during the period of time between 1990,[1] when Plaintiff was instructed by a supervisor not to speak Spanish while in the workplace, and November 1993, when Plaintiff, Dockery, and Wangelin met to discuss the Frey letters and Plaintiff's concerns regarding racially hostile conduct, Plaintiff experienced a racially hostile work environment for which the Red Cross is liable under Title VII and the Arizona Civil Rights Act.

7. Judgment is entered for Plaintiff on this claim.

### B. Discrimination/Disparate Treatment and Wrongful Discharge

8. The Court finds that Plaintiff was an employee an will and that the Red Cross had the right to terminate Plaintiff at any time, except in violation of Title VII and the Arizona Civil Rights Act.

9. Plaintiff establishes a claim under Title VII of the Civil Rights Act of 1964, as amended, and the Arizona Civil Rights Act, if he can show that the Red Cross discriminated against him in the terms, conditions or privileges of his employment because of his national origin, Hispanic. 42 U.S.C. §§ 2000e–2(a) and 2000e–3(a); Arizona Revised States (hereinafter "A.R.S.") §§ 41–1463(B) and 41–1464(A).

10. Plaintiff alleges discrimination under a disparate treatment theory. Plaintiff claims that, in being terminated, he was treated differently than similarly situated non-Hispanic employees. A disparate treatment case is analyzed in accordance with *McDonnell Douglas Corp. v. Green*,

---

1. Trial testimony was inconsistent and vague regarding when Plaintiff was instructed not to speak Spanish in the workplace. Plaintiff testified that the incident occurred in 1988 or 1989. However, Plaintiff's proposed findings of facts and conclusions of law state that the incident occurred in 1990, but provide no month (Pl's Proposed Findings, at 2, para. 6), and Defendant's proposed findings of fact and conclusions of law state that the instruction was given in 1989 or 1990 (Def's Proposed Findings, at 10, para. 38). In their supplemental briefing to the Court, the parties are requested to clarify this date.

411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973): 1) the plaintiff must first establish a prima facie case of discrimination; 2) if the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision; and 3) then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another discriminatory motive. *See also Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994) (quoting *Lowe v. City of Monrovia,* 775 F.2d 998, 1005 (9th Cir.1985), *as amended,* 784 F.2d 1407 (1986)).

11. Plaintiff met his prima facie burden that, in being terminated, he was treated differently than similarly situated non-Hispanic employees.

12. The Red Cross has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff. The Red Cross claims it terminated Plaintiff because of his involvement in an incident with a student on the University of Arizona campus and Plaintiff's later statements to his supervisor about the incident.

13. The Court finds that Plaintiff has not proven by a preponderance of the evidence that the reasons proffered by the Red Cross for terminating Plaintiff were inconsistent or pretextual or based on any discriminatory motive. *See Tarin v. County of Los Angeles,* 123 F.3d 1259, 1264 (9th Cir.1997).

14. After having reviewed all of the relevant evidence, the Court finds that Plaintiff was discharged because of his involvement in an incident with a student on the University of Arizona campus and Plaintiff's later statements to his supervisor about the incident. The Court finds that the Red Cross had legitimate, nondiscriminatory reasons for terminating Plaintiff.

15. The Court finds that the Red Cross did not treat similarly situated non-Hispanic employees differently from Plaintiff. Although neither Early nor Hag-

strom were subjected to the same disciplinary process as Plaintiff, their conduct was not comparable to the conduct of Plaintiff.

16. The Court finds that Plaintiff was not discriminated against on account of his national origin in violation of Title VII or the Arizona Civil Rights Act when he was terminated from his employment with the Red Cross on December 10, 1993.

17. The Court further finds that Plaintiff was not wrongfully discharged in violation of state law when he was terminated from his employment with the Red Cross on December 10, 1993. *See Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 710 P.2d 1025 (1985) (recognizing the tort of wrongful discharge). Although the Arizona Employment Protection Act, A.R.S. § 23–1501 et seq., overruled *Wagenseller* and limited the grounds under which an employee could claim wrongful discharge, *Wagenseller* nevertheless applies here because the Employment Protection Act went into effect July 20, 1996, after Plaintiff's filing of the instant suit.

18. Judgment is entered for Defendants on Plaintiff's claims of disparate treatment and wrongful discharge.

**C. Retaliation**

19. To establish a prima facie case of retaliation, an employee must demonstrate by a preponderance of the evidence that (a) he was engaged in a protected activity; (b) that he suffered adverse employment action; and (c) that there was a causal link between his activity and the employment action. *See Folkerson v. Circus Circus Enters., Inc.,* 107 F.3d 754 (9th Cir.1997).

20. Plaintiff had a reasonable, good faith belief that he was the victim of a racially hostile work environment, and, thus, his complaints concerning such environment constituted a protected activity within the meaning of the statutes, for which retaliation is prohibited. *See Trent*

*v. Valley Elec. Ass'n. Inc.,* 41 F.3d 524 (9th Cir.1994); *Sias v. City Demonstration Agency,* 588 F.2d 692 (9th Cir.1978).

21. For purposes of the causation requirement needed to establish a prima facie case of retaliation, the causal connection between the adverse employment action and the protected activity can be established directly, through evidence of retaliatory animus directed against Plaintiff by Defendant, or indirectly, by showing that the protected activity was followed closely in time by the adverse treatment. *See Miller v. Fairchild Indus., Inc.,* 797 F.2d 727 (9th Cir.1986).

22. Plaintiff has not proven by a preponderance of the evidence than the Red Cross' proferred reasons for terminating Plaintiff were inconsistent or pretextual or that he would not have been terminated but for his previous complaints of discrimination. *See Tarin v. County of Los Angeles,* 123 F.3d 1259, 1264 (9th Cir.1997).

23. After having reviewed all of the relevant evidence, the Court finds that the Red Cross had legitimate reasons for terminating Plaintiff and that the Red Cross' decision to terminate Plaintiff was not based on discriminatory animus or in retaliation for Plaintiff's previous complaints of discrimination.

24. Judgment is entered for Defendants on this claim.

Accordingly, **IT IS HEREBY ORDERED** that **JUDGMENT** is entered for Plaintiff on his claim of hostile work environment and **JUDGMENT** is entered for Defendants on Plaintiff's claims of disparate treatment, wrongful discharge, and retaliation.

**IT IS FURTHER ORDERED** that Plaintiff submit supplemental briefing on or before **May 5, 1999** regarding the amount of damages to which Plaintiff is entitled on his claim of hostile work environment. Plaintiff shall include specific calculations for the period of time discussed in paragraph 6, Conclusions of Law, *supra.* Defendants shall file a response thereto within 10 days thereafter. Plaintiff may

file a reply thereto within 5 days thereafter.