755 A.2d 1080

INSIGNIA RESIDENTIAL CORPORATION

v.

Ruejahlyn ASHTON.

No. 151, Sept. Term, 1999.

Court of Appeals of Maryland.

July 21, 2000.

Adrian V. Nelson, II (Erica D. Brown, Pro Hac Vice, Gina K. Janeiro, Pro Hac Vice, Krupin, Greenbaum & O'Brien, LLC, all on brief), Washington, DC, for appellant.

Matt P. Lavine, Silver Springs, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

In *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981), we confirmed the long-standing common law rule that "an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." We also held, however, that that common law rule is subject to modification both by statute and by judicial decision, and we recognized in *Adler* that a cause of action in tort may lie for the "abusive discharge" of an at-will employee "when the motivation for the discharge contravenes some clear mandate of public policy." *Id.* at 47, 432 A.2d at 473. In *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), we added the caveat that an action for abusive discharge will *not* lie when the public policy violated by the discharge arises from a statute that provides its own remedy

for the violation. A separate tort action, we said, was unnecessary in such a situation. In *Watson v. Peoples Security Life Ins. Co.*, 322 Md. 467, 588 A.2d 760 (1991), we noted that there may be multiple sources of public policy and held that when, in such an instance, at least one public policy mandate violated by a discharge does not arise from a law that provides its own remedy for the violation, an action for abusive discharge based on *that* violation may lie.

■ Appellee, Ruejahlyn Ashton, contends, and a jury in the Circuit Court for Prince George's County found, that she was discharged from her employment by appellant, Insignia Residential Corporation, because she refused to engage in sexual intercourse with one of Insignia's officials, Michael Coleman. A discharge for such a reason constitutes a violation of Federal and State employment discrimination laws that provide one or more remedies for the violation. Accordingly, in Insignia's view, *Makovi* controls, and an action for tortious abusive discharge is precluded. Ms. Ashton responds that a discharge in retaliation for her refusal to acquiesce in what she regards as a form of *quid pro quo* sexual harassment also violates an independent mandate of public policy. Maryland Code, Article 27, § 15 prohibits a person from engaging in prostitution. Coleman's entreaties, she avers, constituted a solicitation for her to engage in prostitution, as defined in § 16—to offer her body for sexual intercourse for hire—but there is no other civil remedy available to her for the loss of her employment due to her resistance to that entreaty. The tort action for abusive discharge is therefore necessary in her view to vindicate the public policy against prostitution. The issue thus presented by Ms. Ashton is whether Maryland recognizes a common law wrongful discharge claim based on a theory that she was wrongfully discharged because she refused to acquiesce in a form of "quid pro quo" sexual harassment that would have amounted to an act of prostitution.[1]

---

1. The issue articulated by Insignia, as appellant, is much broader— whether Maryland recognizes a wrongful discharge action based on a theory that the employee was wrongfully terminated "because she

The Circuit Court for Prince George's County held that such a claim *is* cognizable. We agree and shall affirm.[2]

## BACKGROUND

Ms. Ashton's employment relationship with Insignia lasted only three months—from December 2, 1996 to March 1, 1997. Much of the evidence regarding that relationship was in dispute, but, as Ms. Ashton prevailed on the wrongful discharge claim, we shall view the evidence in the light most favorable to her.

Insignia owns and operates a number of apartment developments along the East Coast. Ms. Ashton lived in one of those developments, known as Glenarden Two. In November, 1996, she applied for a job with Insignia at the Insignia office located in the apartment development. She was interviewed by Michael Coleman, Insignia's on-site Property Manager, and Michael Peeples, its Regional Property Manager. Soon after her interview, Mr. Peeples called her and offered her a job. When Ms. Ashton reported for work on December 2, 1996, Mr. Coleman was on vacation, and she was assigned to work as an office assistant. Upon Coleman's return, he promoted her to the position of assistant property manager.

Ms. Ashton alleged that a pattern of sexual harassment commenced about two weeks after she began work. It first involved Mr. Peeples, who, in contravention of company policy,

refused to acquiesce to 'quid pro quo' sexual harassment." Ms. Ashton phrases the question as whether an action lies when the employee is terminated "because she refused to become her boss's prostitute." Ashton's statement of the issue, though lacking legal formalism, is the more appropriate one, given the facts in this case. "Quid pro quo sexual harassment" covers a wide range of conduct, much of which might not fall under Article 27, §§ 15 and 16, and, although the answer may be the same with respect to some of that penumbral conduct, that issue is not before us in this case and we do not address it.

**2.** Ms. Ashton never asserted the laws against pandering, contained in §§ 426–433 of Article 27, as providing a public policy mandate with respect to the conduct attributed to Mr. Coleman, so we shall not consider whether an action for abusive discharge may be based on the violation of those statutes.

called her at home one evening and asked her to come to a hotel where he was staying and sleep with him. He said that he could help Ms. Ashton "move forward" in the company. Ms. Ashton declined the offer and complained to Michael Coleman's brother, Emmanuel, whom she knew and who also worked for Insignia. Her complaint eventually reached Jack Cervilla, Insignia's Regional Vice President, who called Ms. Ashton to assure her that Peeples would be transferred and would no longer have occasion to be at the Insignia office on the Glenarden Two property. He asked if she wanted to file a formal complaint against Peeples, to which she replied that she just wanted to be left alone.

Despite Cervilla's assurance, Peeples continued to visit the property for a time—until the end of December. Ms. Ashton said that she wrote to Mr. Cervilla about Peeples's continued presence, which she found discomforting, even though there were no further incidents of harassment on his part. The next upsetting event was at an office Christmas party, when Michael Coleman asked Ms. Ashton "when was I going to go out with him, when I was going to sleep with him." He added that, if she slept with him, "he could help me out" and that she "could go places." She declined, whereupon, somewhat inconsistently, he apologized but grabbed her chest area. She made no complaint about the episode. Coleman made no further sexual comments after the party although, according to Ms. Ashton, he did other things such as "rubbing up against me if I'm trying to make copies or stuff like that."

At the end of January, an incident, which later served as the asserted basis for her termination, occurred in the building in which Ms. Ashton lived. A downstairs neighbor, Ms. Wichard, was allegedly playing music too loudly late at night. Ms. Ashton asked another neighbor, Ms. Potts, who worked with Ms. Ashton for Insignia, to accompany her to Ms. Wichard's apartment in order to quell the disturbance. According to Ms. Potts, Ms. Ashton cursed Ms. Wichard, although Ms. Ashton said that she merely asked the woman to lower the noise. The incident was reported, however, to Mr. Coleman, who informed Ms. Ashton that he intended to investigate the

matter. On February 9, 1997, Ms. Ashton wrote to Mr. Coleman, complaining that she had not received the increase in salary that should have accompanied her promotion from office assistant to assistant property manager. She stated as well in her letter her belief that it was unacceptable to "date in the office" and expressed the hope that he would not "take it personal because I won't go out with you." At some point, according to Ms. Ashton, Mr. Coleman told her that she "wasn't serious about the job or the raise" because, "[i]f I was I would have gone out with him. I would have slept with him."

The next significant contact with Mr. Coleman came on February 14. In the course of another conversation, he told Ms. Ashton that she was being discharged because of the incident with Ms. Wichard. When Ms. Ashton began to cry, Mr. Coleman relented but then asked her to sleep with him and advised that "[i]f I go out with him everything would be all right." She declined, announced that she was quitting and intended to sue, and turned to leave the office, whereupon Coleman hugged her and squeezed her breasts. Ashton left the office, followed by Coleman, who apologized and asked her not to quit. She agreed, apparently on the condition that he would not touch her again or ask "any questions about being in relations with him." Two days later, she wrote to him, again advising of her policy not to date co-workers or supervisors and of her discomfort in being hugged and squeezed.

On March 1, 1997, Mr. Coleman informed Ms. Ashton in writing that she was being discharged due to the confrontation she had with Ms. Wichard. Coleman indicated that Ms. Wichard had complained that Ms. Ashton verbally abused her by calling her several degrading names and that Ms. Potts and another resident had confirmed her inappropriate behavior. In February, 1998, Ms. Ashton filed this lawsuit. Although several causes of action were initially pled against Insignia, Coleman, and Peeples, the case proceeded to trial on only two counts—a claim of battery against Coleman for the offensive touching that allegedly occurred on February 14, 1997, and a wrongful discharge claim against Insignia. The latter count

charged that "[t]he actual reason for the termination was that the Plaintiff had twice refused to exchange her job status for sexual favors," that "[t]he demand, that the Plaintiff act as a prostitute, violates public policy," and that "[i]t is a violation of Maryland's public policy to terminate the Plaintiff for refusing to comply with the demands of her supervizors [*sic*] at Insignia."

After listening to all of the evidence, including Mr. Coleman's denials of much of what Ms. Ashton had to say, the jury found that Coleman had *not* intentionally and offensively touched Ms. Ashton, and thus returned a verdict for him on the battery claim. The jury did find, however, that Ms. Ashton was terminated from her employment because she refused to engage in a sexual relationship with Coleman. Upon that verdict, it awarded her damages of $22,240. This appeal ensued when the court denied Insignia's motion for judgment N.O.V. with respect to the wrongful termination claim.

## DISCUSSION

We have set forth above, in summary fashion, the holdings in *Adler*, *Makovi*, and *Watson* that frame the issue. We need now to consider *Makovi* and *Watson* in greater detail and to bring in some other cases.

Ms. Makovi was employed, on an at-will basis, as a chemist in a Sherwin–Williams paint factory. In October, 1983, upon its discovery that Ms. Makovi was pregnant, the employer informed her that she could not work at her job while pregnant and that her pay and medical benefits would cease until she became "disabled" because of the pregnancy. Makovi filed an employment discrimination complaint with the Federal Equal Employment Opportunity Commission, which determined that there was not "reasonable cause to believe" that she had been the victim of sex discrimination but notified her of her right under Title VII of the Civil Rights Act of 1964 to file an action in U.S. District Court. Instead, she filed a tort action for abusive discharge in the Circuit Court for Baltimore

City. She asserted that the employer's health concern was a pretext and that her discharge violated the public policy embodied in Title VII and in Article 49B of the Maryland Code. The Circuit Court dismissed the complaint, and we affirmed.

■ Although at the beginning of the Opinion we announced the principle that an action for abusive discharge was "inherently limited to remedying only those discharges in violation of a clear mandate of public policy which otherwise would not be vindicated by a civil remedy," *Makovi,* 316 Md. at 605, 561 A.2d at 180, our holding in the case was more limited. The only asserted basis for the public policy mandate allegedly violated by Sherwin–Williams was that arising from Title VII and the Maryland counterpart in Article 49B. Those laws, we pointed out, not only created the prohibition against employment discrimination on the ground of sex but provided certain remedies for the violation of that prohibition, including injunctive relief, reinstatement as an employee, and an award of back pay. It was thus that we agreed with the employer's argument that the tort of abusive discharge does not lie "where the public policy sought to be vindicated by the tort *is expressed in a statute which carries its own remedy for vindicating that public policy."* *Id.,* 316 Md. at 609, 561 A.2d at 182 (emphasis added). We returned twice to that theme. We pointed out that Ms. Makovi's argument that the judicially created tort occupies "the entire spectrum of discharges which are contrary to public policy" failed to recognize "that the remedies provided to eliminate prohibited discrimination form part of the anti-discrimination policy." *Id.,* 316 Md. at 621, 561 A.2d at 188. Our ultimate conclusion was that, in cases of discharge motivated by employment discrimination prohibited by Title VII and Art. 49B:

> "the statutes create both the right, by way of an exception to the terminable at-will doctrine, and remedies for enforcing that exception. Thus, the generally accepted reason for recognizing the tort, that of vindicating an otherwise civilly unremedied public policy violation, does not apply. Further, allowing full tort damages to be claimed in the name of

vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legislature in establishing the very policy relied upon."

*Id.* at 626, 561 A.2d at 190. *See also Chappell v. Southern Maryland Hosp., Inc.,* 320 Md. 483, 578 A.2d 766 (1990).

■ Insignia reads *Makovi* as barring a tort action for abusive discharge whenever the discharge might be found to be an act of sexual harassment for which a remedy exists under the employment discrimination laws. That is not the case. Ms. Makovi's action was barred because it was based exclusively on those employment discrimination laws. The only right allegedly transgressed was that arising from those laws, for which a statutory remedy was provided. We expressly left open the prospect of an action for abusive discharge lying when the discharge violated a mandate of public policy independent of the employment discrimination laws. Presaging this very case, we noted:

"Sometimes the facts underlying a discharge constitute both a violation of an anti-discrimination statute and of another, more narrowly focused, statute reflecting clear public policy but providing no civil remedy. *Lucas v. Brown & Root, Inc.,* 736 F.2d 1202 (8th Cir.1984) illustrates an analysis which utilizes the narrower ground. There the plaintiff alleged that she had been fired because she refused to sleep with her foreman. The court reasoned that '[a] woman invited to trade herself for a job is in effect being asked to become a prostitute.' *Id.* at 1205. Prostitution was a crime denounced by Arkansas statute. The Eighth Circuit predicted the Supreme Court of Arkansas would find an abusive discharge because the plaintiff 'should not be penalized for refusing to do what the law forbids.' "

*Makovi,* 316 Md. at 620, 561 A.2d at 187.

The prospect that we left open in *Makovi* became confirmed in *Watson.* Ms. Watson, an at-will insurance sales agent, was subjected to sexual harassment on three occasions by a fellow employee. The first occasion involved offensive verbal invitations to engage in sexual activity. Ms. Watson complained to

a supervisor, who laughed and told her not to worry. The second incident involved a battery and an assault—the co-worker placed his hands on her shoulders and attempted to bite her breast. When that incident was reported, the supervisor ordered the co-worker to stay away from Ms. Watson. The third incident involved both an assault and verbal abuse. On March 13, shortly after the third incident, Ms. Watson filed an action against the co-worker and the employer, charging both with assault and intentional infliction of emotional distress and charging the employer with failure to remedy the first incident and abate the harassment. She requested medical leave for the next day, March 14, which was granted.

When the employer learned of the suit, a regional vice-president called a meeting in order to investigate the matter. Ms. Watson refused to meet with the official unless her lawyer was present, a condition rejected by the vice-president. She also refused to attend the regular weekly meeting of sales agents set for March 21, after being warned that she would be discharged if she did not appear. By letter dated March 20, Ms. Watson was discharged, allegedly for failing to appear at the March 14 meeting and for failing to report to work on March 20. Following her discharge, Ms. Watson amended her complaint to add another count, for abusive discharge, claiming that her discharge was in retaliation for her having filed the lawsuit against the employer and the co-worker, in contravention of her Federal and State Constitutional rights of free speech and to petition the court for redress. At trial, all claims but two were dismissed. The jury found that the co-worker had assaulted Ms. Watson and returned a judgment in her favor against him. It also found that Ms. Watson had been wrongfully discharged and awarded damages of $35,000. The Court of Special Appeals reversed the judgment against the employer, effectively holding that the tort of abusive discharge would not lie when the motivation for the discharge was to remove an employee who was actively suing the employer.

We, in turn, vacated the judgment of the Court of Special Appeals, but on a very limited and focused basis. The trial

court's instructions allowed the jury to find that the discharge was abusive if it was in retaliation for Ms. Watson's exercise of her general Constitutional right to redress in the courts. That, we held, was error, but, because there was some question whether the employer had preserved the issue, we did not decide the case on that basis. We agreed with the intermediate appellate court that, absent a statute expressing a clear mandate of public policy, there is ordinarily no public policy violated by an employer who discharges an at-will employee in retaliation for the employee suing the employer, at least when the dispute is over compensation or other benefits. In such a circumstance, we said, the employer is not required either to retain a disgruntled employee or risk an abusive discharge suit. *Watson*, 322 Md. at 478–79, 588 A.2d at 765.

We also concluded that an action for abusive discharge could not be founded upon a lawsuit against the employer based on its toleration of a "hostile environment" form of sexual discrimination. Hostile environment sexual discrimination is actionable under Title VII. Indeed, we held that "[t]he source of the policy against hostile environment sexual discrimination is statutory, and exclusively statutory." *Id.* at 480, 588 A.2d at 766. Those statutes, we noted, provide the remedies for their violation, and, citing *Makovi*, we concluded that "the abusive discharge tort would not reach [the employer's] retaliation even if Watson's suit against it is interpreted to be based on [the employer's] permitting a 'hostile environment' in which [the co-worker] committed the assault." *Id.*

The saving feature for Ms. Watson was the prospect that the jury may have found that her discharge was motivated by her suit against the co-worker for assault and battery. Based on this possibility, we held that "it is contrary to a clear mandate of public policy to discharge an employee for seeking legal redress against a co-worker for workplace sexual harassment culminating in assault and battery." *Id.* at 480–81, 588 A.2d at 766. We explained that the public policy that may have been violated "was the individual's interest in preserving bodily integrity and personality, reinforced by the state's interest in preventing breaches of the peace, and reinforced by

statutory policies intended to assure protection from workplace sexual harassment." *Id.* at 481, 588 A.2d at 767.

In finding the prospect of liability on that basis, we rejected the employer's argument, made here as well, that the case was controlled by *Makovi.* Preclusion under *Makovi,* we iterated, applies only when the public policy sought to be vindicated "is expressed in a statute which carries its own remedy for vindicating that public policy." *Id.* at 485, 588 A.2d at 768 (quoting *Chappell v. Southern Maryland Hosp., Inc., supra,* 320 Md. at 490, 578 A.2d at 770). Preclusion was *not* mandated, however, simply because the assault and battery arose out of workplace sexual harassment. We explained that public policy, manifested in both the civil and criminal law, provided sanctions against the harmful and offensive touching of the person, whether or not sexually motivated, long before either Title VII or Art. 49B was enacted, and that, had those statutes never been enacted, that independent mandate of public policy would have supported Ms. Watson's recourse against the co-worker. Thus, we noted, there were "multiple sources of public policy, some within and some without Title VII and [Art. 49B]" and that, "[b]y including prior public policy against sexual assaults, the anti-discrimination statutes reinforce that policy; they do not supersede it." *Id.* at 486, 588 A.2d at 769. Indeed, we pointed out that *Makovi* itself "foreshadowed this approach to multiple sources of public policy" by its "favorable reference" to *Lucas v. Brown & Root, Inc., supra,* 736 F.2d 1202, a decision "sustaining the tort where the discharge was in retaliation for resisting *quid pro quo* sexual harassment." *Id.*

*Lucas* is close in point. Ms. Lucas was an at-will employee who claimed that she was discharged because she refused to sleep with her foreman. She sued in Federal court under Title VII and, alleging diversity of citizenship, for breach of contract and intentional infliction of emotional distress. The Eighth Circuit Court of Appeals affirmed the dismissal of her Title VII claim because it was filed too late but, applying Arkansas law, reversed the dismissal of her State law claims, predicting that they would be found viable by the Arkansas

Supreme Court. Arkansas law recognized, it said, a public policy exception to the at-will employment doctrine, allowing an action for breach of contract when a discharge was in violation of public policy. The court took note of the Arkansas equivalent to Article 27, § 15, making prostitution a crime. It declared that "[a] woman invited to trade herself for a job is in effect being asked to become a prostitute," and that a "[p]laintiff should not be penalized for refusing to do what the law forbids." *Lucas*, 736 F.2d at 1205. Accordingly, it held that Ms. Lucas had pled a sufficient cause of action for breach of contract. The court rejected the employer's argument that allowance of such a claim would circumvent the limitations of Title VII, noting the non-preemption provision in 42 U.S.C. § 2000e–7.

*Lucas* does not stand alone. A similar result was reached in *Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F.2d 530 (4th Cir.1991). There, too, an at-will employee sued for abusive discharge, claiming that she was discharged for refusing to accede to the sexual demands of the employer. Applying North Carolina law, the Fourth Circuit Court of Appeals determined that North Carolina recognized a breach of contract action when an at-will employee is discharged for refusing to violate the law, that North Carolina, by statute, prohibits prostitution, that "the exchange of sexual intercourse for the valuable economic benefit of a job fits within North Carolina's criminal prohibition," that the plaintiff was asked to commit a criminal act and was fired for refusing, and that her complaint therefore "states a claim for wrongful discharge." *Id.* at 534.

In *Collins v. Rizkana*, 73 Ohio St.3d 65, 652 N.E.2d 653 (1995), an at-will employee was subjected to repeated sexual harassment in the form of offensive touchings and inappropriate language, and, when she refused to sign a paper attesting that that conduct had not occurred, she was fired. An Ohio statute precluded a person from having sexual contact with another, not the person's spouse, when the offender knows that the sexual contact is offensive. Both that statute and the employment discrimination laws established a clear public

policy against workplace sexual harassment, and, citing *Watson, supra,* the court concluded that "[i]n cases of *multiple-*source public policy, the statute containing the right and remedy will not foreclose recognition of the tort on the basis of some other source of public policy, unless it was the legislature's intent in enacting the statute to preempt common-law remedies." *Collins,* 652 N.E.2d at 660 (emphasis in original).[3] *See also Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 710 P.2d 1025 (1985), *superceded by statute as stated in Chaboya v. American Nat. Red Cross,* 72 F.Supp.2d 1081 (D.Ariz.1999) (action for wrongful discharge recognized when at-will employee discharged for refusing to engage in act that would constitute indecent exposure under Arizona statute).

In *McNeil v. State,* 356 Md. 396, 739 A.2d 80 (1999), we traced the history of the efforts in Maryland and elsewhere to control prostitution and the social problems generated by the commercialization of that activity. The statute precluding prostitution and attempts to induce or coerce women and men into engaging in prostitution represents a clear mandate of public policy that is violated when an at-will employee is discharged for refusing to engage in conduct that would constitute prostitution (or lewdness or assignation, which is also prohibited by § 15 of Article 27). The fact that both the inducements themselves and a discharge for rejecting them may constitute a violation of the Federal and State employment discrimination laws does not require that we ignore that such conduct also violates the entirely separate, independently based, public policy embodied in § 15. Ms. Ashton's action for abusive discharge is not precluded by *Makovi;* it is authorized by *Watson.*

JUDGMENT AFFIRMED, WITH COSTS.

---

**3.** The majority opinion in *Collins* is rather far-reaching in its search for public policy, and we do not necessarily endorse all of it. The three concurring Justices would have recognized the cause of action for a discharge in violation of the public policy against offensive sexual contact manifested in the particular statute. The full court was in agreement on that much.

Concurring opinion by ELDRIDGE, J.

Dissenting opinion by CATHELL, J., in which HARRELL, J., joins.

ELDRIDGE, J., concurring.

I concur in the judgment for the reasons set forth in my concurring and dissenting opinion in *Watson v. Peoples Security Life Ins. Co.*, 322 Md. 467, 487, 588 A.2d 760, 770 (1991); in Judge Adkins's dissenting opinion, joined by Judges Eldridge and Cole, in *Chappell v. Southern Maryland Hosp.*, 320 Md. 483, 498–503, 578 A.2d 766, 774–776 (1990); and in Judge Adkins's dissenting opinion, joined by Judges Eldridge and Cole, in *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 627–646, 561 A.2d 179, 190–200 (1989). *See also Caldor v. Bowden*, 330 Md. 632, 677, 625 A.2d 959, 980–981 (1993) (Eldridge, J., joined by Bell, J., dissenting).

An employee such as the plaintiff Ashton, who is discharged from her employment because she refuses to engage in sexual intercourse with one of her employer's officials, clearly has a common law cause of action in tort for abusive discharge under the principles set forth in *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981). That common law cause of action under *Adler* should not be precluded simply because there may exist limited statutory remedies under the Human Relations Article of the Maryland Code (Art. 49B) or Title VII, particularly since this Court has held that the Art. 49B and Title VII remedies are neither exclusive nor primary. *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford*, 307 Md. 1, 19–30, 511 A.2d 1079, 1088–1094 (1986). *See also, e.g., Zappone v. Liberty Life*, 349 Md. 45, 64–66, 706 A.2d 1060, 1070 (1998); *Makovi v. Sherwin–Williams Co., supra*, 316 Md. at 631–638, 561 A.2d at 193–196 (Adkins, J., dissenting); *National Asphalt v. Prince Geo's Co.*, 292 Md. 75, 79–80, 437 A.2d 651, 653–654 (1981). The General Assembly has neither restricted the common law cause of action for abusive discharge recognized in *Adler v. American Standard Corp., supra*, nor modified our holdings that the Article 49B remedy is not exclusive or primary.

The majority today circumvents this Court's ill-advised opinion in *Makovi v. Sherwin–Williams Co., supra*, by stating

that the holding in that case was more limited than the language of the opinion, and by the strained route of relying on the criminal statute making it unlawful "[t]o engage in prostitution. . . ." Code (1957, 1996 Repl.Vol.), Art. 27, § 15(g). If that were the only way to afford relief to someone who was fired because she refused to have sexual intercourse with her boss, I would mute my protest. The straightforward and more principled way to afford relief to those in the plaintiff's position, however, is to overrule *Makovi* and its progeny.

CATHELL, J., dissenting:

I respectfully dissent. Judge Eldridge writes separately in concurrence because the majority declines to overrule *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), and its progeny. I write in dissent because the majority fails to apply the holding of *Makovi v. Sherwin–Williams Co.*, *supra*.

I do agree with most of Judge Eldridge's statement that

[t]he majority today circumvents this Court's . . . opinion in *Makovi v. Sherwin–Williams Co.*, *supra*, by stating that the holding in that case was more limited than the language of the opinion, and by the strained route of relying on the criminal statute making it unlawful "[t]o engage in prostitution. . . ."

Normally, I might be inclined to defer to the majority's apparently superior academic knowledge of the subject matter, but, under its reasoning, a person declining a sexual entreaty "until the ring is on my finger," is a prostitute or a person requesting sexual activity, promising marriage, or any number of other things in return, is soliciting prostitution. With its opinion, the majority, by logical inferential extension, has, I fear, turned millions of Marylanders into prostitutes or those who solicit prostitution.

Whatever the majority and others think prostitution is, this, in vernacular language, "ain't it."

I would reverse.

Judge HARRELL has authorized me to state that he joins in the views expressed herein.