**William J. LEE**

v.

**Jan L. PFEIFER, et al.**

**Civil No. L–95–1180.**

United States District Court,
D. Maryland.

Feb. 15, 1996.

E. David Hoskins, Towson, MD, for plaintiff.

Russell H. Gardner and Patricia A. Sumner, Baltimore, MD, for defendants.

## MEMORANDUM

LEGG, District Judge.

Now pending is plaintiff's Motion to Remand. The Court must decide whether an employee's assault and intentional infliction of emotional distress claims against a co-worker and an employer are preempted by section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Plaintiff, William Lee, Sr., the employee, was covered by a collective bargaining agreement. For the reasons stated below, the Court shall grant the motion in part and dismiss the complaint in part.

## I. PROCEDURAL BACKGROUND

On February 27, 1995, Lee filed suit in the Circuit Court for Baltimore County against Martin Marietta Corporation ("Martin Marietta"), his employer, and Jan L. Pfeifer, a former supervisor. The complaint includes three counts. Count I asserts a claim of assault against Pfeifer. Count II asserts a claim of intentional infliction of emotional distress against Pfeifer. Count III alleges that Martin Marietta is vicariously liable because Pfeifer's acts were committed within the scope of his employment or were ratified by Martin Marietta.

█ Martin Marietta filed a Notice of Removal asserting that this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). Martin Marietta bases its removal on the "complete preemption doc-

504

trine." Section 301 of the LMRA preempts a plaintiff's state law claims if they "relate to" a collective bargaining agreement. *See Childers v. Chesapeake & Potomac Tel. Co.,* 881 F.2d 1259, 1261–62 (4th Cir.1989) (discussing the complete preemption doctrine). Plaintiff moved to remand on the ground that resolution of the state law claims does not require interpretation of the collective bargaining agreement.

After examining the parties' briefs, the Court held a hearing [1] on November 30, 1995. Because it was unclear whether Lee's factual allegations were sufficient to support liability on any theory, the Court requested further briefing. Lee submitted a supplemental affidavit setting out in greater detail the facts underlying the three counts in the complaint. The issue is now ripe for decision.

## II. LEGAL STANDARD

■ The goal of § 301 preemption is to promote the uniform interpretation of collective bargaining agreements. *McCormick v. AT & T Technologies, Inc.,* 934 F.2d 531, 538 (4th Cir.1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 912, 116 L.Ed.2d 813 (1992). Congress believed that uniformity would be promoted by interpreting collective bargaining agreements according to a body of federal, rather than state, common law. *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); *Martin Marietta Corp., Aero & Naval Sys. v. Maryland Comm'n on Human Relations,* 38 F.3d 1392, 1397 (4th Cir.1994). Congress therefore assigned the federal courts the responsibility of interpreting such agreements using national, federal standards. Preemption is "complete" when a plaintiff's state law claim is within the ambit of § 301. The claim is both removable to federal court and conflicting state laws are

supplanted by federal law. *See McCormick,* 934 F.2d at 534.

■ Complexity arises because § 301 does not displace state law entirely in the labor relations context. Section 301 displaces only those state claims that must be resolved by interpreting the applicable collective bargaining agreement. *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988); *see Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985) ("Of course, not every dispute concerning employment, or tangentially involving a provision of a collective bargaining agreement, is preempted by § 301 or other provisions of federal labor law."). " '[A] State may provide [substantive rights] to workers when adjudication of those rights does not depend upon the interpretation of [collective bargaining] agreements.' " *McCormick,* 934 F.2d at 535 (quoting *Lingle,* 486 U.S. at 409, 108 S.Ct. at 1883).

■ The difficulty arises in determining when interpretation of the collective bargaining agreement is (or is not) required. Although the Supreme Court enunciated a test for preemption in *Lingle,* the circuits vary in their approach to the test.[2] Because of the difficulty in determining when interpretation of a collective bargaining agreement is required, the Fourth Circuit has adopted a methodology that avoids this inquiry when the underlying claims are legally insufficient. Under *Childers,* a federal district court may first determine "whether the claimant has alleged a colorable state-law cause of action." 881 F.2d at 1262. In making this inquiry, the Court is not limited to the face of the complaint, but may undertake a reasonable,

1. The telephonic hearing was recorded on audiotape in chambers.

2. Compare, for example, *Galvez v. Kuhn,* 933 F.2d 773 (9th Cir.1991), and *Childers,* 881 F.2d 1259. In the Fourth Circuit, prior to engaging in the preemption analysis, a court must examine the facts of the case in some manner to determine whether a colorable state claim exists under state law. *Childers,* 881 F.2d 1259. The Fourth Circuit approach permits the court to "address the validity of the alleged state-law

claim during the course of the preemption inquiry," resulting in a "judgment on the merits." *Id.* at 1262.

In contrast, in the Ninth Circuit the merits of the underlying claim should not be addressed prior to the preemption analysis. *Galvez,* 933 F.2d at 779. The Ninth Circuit expressly stated that it has no power to deal with the case on the merits unless the state law claim is preempted. *Id.* at 776.

albeit circumscribed, inquiry into the facts.[3] If the plaintiff does not state an actionable state claim, then the claim may be dismissed on the merits prior to engaging in the pre-emption analysis. *Id.*

As explained by the Fourth Circuit, the process of examining the apparent merits of the claim prior to engaging in preemption analysis is efficient. *Id.* "Courts, whether federal or state, do not exist merely to re-solve claims; they exist to decide lawsuits." *Id.* By dismissing an unsound suit at the threshold, the court spares the litigants the time and effort of continuing to litigate a legally insufficient claim.[4] *Id.*

■■■ Once the court is satisfied that the plaintiff presents a valid state law claim, the court next must determine whether that claim is preempted by § 301 of the LMRA. The central inquiry in preemption analysis is whether the interpretation of a collective bar-gaining agreement would be required to re-solve the claims. *Lingle,* 486 U.S. at 413, 108 S.Ct. at 1885. The Fourth Circuit has elabo-rated upon this standard, holding that "[s]tate tort claims are preempted where ref-erence to a collective bargaining agreement is necessary to determine whether a 'duty of care' exists or to define 'the nature and scope that duty, that is, whether, and to what ex-tent, the [employer's] duty extended to the particular responsibilities alleged by [the em-ployee] in h[is] complaint.'" *McCormick,* 934 F.2d at 536 (quoting *International Bhd. of Electrical Workers v. Hechler,* 481 U.S. 851, 862, 107 S.Ct. 2161, 2168, 95 L.Ed.2d 791 (1987)). If interpretation of the collective

bargaining agreement is required, the state law claims are preempted and the suit prop-erly remains in federal court.

## III. ANALYSIS

### A. *VIABILITY OF STATE LAW CLAIMS*

Plaintiff's claims grow out of a dispute between Lee and his former supervisor, Pfeifer. On July 5, 1994, Lee filed a griev-ance against Pfeifer for harassment allegedly occurring on June 23, 1994. (Compl. ¶ 6.) Lee complained that Pfeifer forced him to work overtime and also refused to provide him with personal leave. (Defs.' Opp'n to Mot. for Remand, Ex. B.) Pfeifer, as Lee's first level supervisor, dismissed the griev-ance, asserting that his actions were justified by Lee's poor performance and attendance. (Defs.' Opp'n to Mot. for Remand, Ex. C.) Lee contends that Pfeifer, angered by the grievance, assaulted Lee and subjected him to the intentional infliction of emotional dis-tress. Lee also contends that Martin Mar-ietta ratified Pfeifer's misconduct.

### 1. *COUNT I: ASSAULT*

■■■ In Maryland, the tort of assault con-sists of two basic elements. First, the plain-tiff must prove that he was threatened by a defendant who possessed the apparent pres-ent ability to carry out that threat. *See* Paul M. Sandler and James K. Archibald, *Plead-ing Causes of Action in Maryland,* 79–80 (1991); *Continental Casualty Co. v. Mira-bile,* 52 Md.App. 387, 449 A.2d 1176, 1183 (1982) ("An assault is any unlawful attempt

---

3. The *Childers* court would permit dismissal of a state claim only when the "lack of merit is ap-parent." *Childers,* 881 F.2d at 1262. In deter-mining whether Childers' claims were meritless, Judge Wilkinson briefly examined both the ele-ments of the state law claims and the facts sup-porting those claims. The court in *Jackson v. Kimel,* 992 F.2d 1318 (4th Cir.1993) similarly evaluated the claims for their merit prior to resolving the preemption issue:

 Although the district court granted summary judgment on the basis of § 301 preemption, we will consider whether [the plaintiff] has prof-fered sufficient evidence to survive summary judgment on her state law claims before ad-dressing whether the claims are preempted. This approach is consistent with *Childers v. Chesapeake & Potomac Tel. Co.,* 881 F.2d 1259,

1263 (4th Cir.1989), where we specifically held that "[t]he § 301 preemption inquiry is predi-cated on the existence of a colorable state cause of action."

 *Id.* at 1322.

4. In *Childers,* the Fourth Circuit examined the entire lawsuit and determined that it was merit-less. The court concluded that it was efficient to dispose of the unsound suit rather than remand to the state court where it would inevitably be dismissed, albeit after an additional expenditure of resources. In the subsequent case of *Jackson v. Kimel,* 992 F.2d 1318 (4th Cir.1993), the Fourth Circuit utilized the *Childers* approach when fewer than all claims could be finally adju-dicated.

to cause a harmful or offensive contact with the person of another or to cause an apprehension of such a contact."). Second, the defendant's actions must have raised in the plaintiff's mind an apprehension of imminent bodily harm. *See* Sandler & Archibald, *supra,* at 79–80. Although the first element is measured by a standard of reasonableness, the second element is measured by an entirely subjective standard.[5]

As stated in the complaint, the gravamen of plaintiff's assault claim concerns an incident which occurred in the early morning hours of August 18, 1994. According to Lee,[6] Pfeifer walked towards Lee "with a look of rage on his face, ... stopped in front of [Lee] and glared at the Plaintiff." (Compl. ¶ 17.) In his affidavit, Lee asserts that Pfeifer "got nose to nose" with him. (Supplemental Mem. in Supp. of Mot. to Remand, Ex. A ¶ 15.) Pfeifer then "continued to hover around the Plaintiff glaring at the Plaintiff." (Compl. ¶ 19.) Ultimately, Lee called security and Pfeifer left the area. (Compl. ¶¶ 20, 21.)

■ Even as further developed in his affidavit, Lee's assault claim is tenuous. Lee does not allege the Pfeifer raised his fist as if to strike or, by word or deed, threatened to hit him. Nevertheless, the court cannot conclude, on the basis of a truncated *Childers* factual inquiry, that Lee's claim is so weak that it must be dismissed. A reasonable jury might conclude that an assault occurred if Pfeifer menaced Lee by coming "nose to nose" with him.[7]

### 2. COUNT II: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ Four elements are essential to state a claim for intentional infliction of emotional distress in Maryland:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

*Harris v. Jones,* 281 Md. 560, 380 A.2d 611, 614 (1977). Additionally, the context of an employment relationship, with its inherent opportunities for abuse of authority, "is a factor to be considered when analyzing whether an employer's behavior was so outrageous that he or she has committed the tort of intentional infliction of emotional distress." *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby,* 326 Md. 663, 607 A.2d 8, 15 (1992).

The employment relationship, however, "may not always inure to the employee's benefit in claims of intentional infliction of emotional distress." *Id.* The *Weathersby* court explained:

The workplace is not always a tranquil world where civility reigns. Personality conflicts and angst over disciplinary actions can be expected. Even a certain amount of arbitrary nastiness may be en-

---

5. *See* Sandler & Archibald, *supra,* at 79–80 ("The plaintiff's apprehension of imminent bodily harm is judged by a subjective standard. Consequently, the defendant may be liable for assault even though his actions would not put a person of ordinary courage in such apprehension."); Restatement (Second) of Torts § 27 (1965) ("If an act is intended to put another in apprehension of an immediate bodily contact and succeeds in so doing, the actor is subject to liability for an assault although his act would not have put a person of ordinary courage in such apprehension.").

6. Although Pfeifer does not dispute that he approached Lee on this occasion, Pfeifer contests Lee's description of this encounter. (Supplemental Mem. in Opp'n to Mot. to Remand, Ex. B ¶¶ 19, 20.)

7. Although not mentioned in the complaint, Lee alleged in his affidavit that Pfeifer drove at him with an electrical cart. (Supplemental Mem. in Supp. of Mot. to Remand, Ex. A ¶ 4.) Specifically, Lee claims that Pfeifer "started harassing me by driving his electrical cart directly at me and swerving at the last second to avoid hitting me. I was afraid he was going to hit me with the electrical cart." *Id.* Although Lee raises the issue of assault by electrical cart for the first time in his affidavit, the Court will assume that he is relying upon this allegation as part of his assault claim. The electrical cart incident satisfies the elements of an assault claim and therefore provides an alternative basis for not dismissing this claim.

countered at all levels in all occupations; this is a fact of life we must accept as readily as we recognize that employers and employees on the job interact differently than do friends at a summer picnic.

*Id.* at 16. Furthermore, the Maryland Court of Appeals has emphasized that "the tort is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Id.* at 11.

According to Lee, the following occurred: [8]

(1) On July 5, 1994, the day Lee filed his grievance, as Lee punched out at the time clock Pfeifer stood near Lee and "stated over and over again 'Boo-hoo-hoo, we all have problems. Boo-hoo-hoo, we are all big cry babies.' " (Compl. ¶ 7.)

(2) Shortly thereafter, Lee overheard Pfeifer enter Bill Bradley's office "ranting and raving" regarding the grievance filed by Lee. (Compl. ¶¶ 8, 9.) Upon reporting these actions to Mr. Bethel, Pfeifer's supervisor, Lee was told that Bethel did not want to get involved. (Compl. ¶ 10.)

(3) After filing the grievance, Pfeifer was laid off as a plumber but was put on the second shift as a janitor. (Compl. ¶ 11.) Pfeifer's shift was also temporarily changed such that the shifts of the two men overlapped only between 11:30 p.m. and 12:30 a.m. (Compl. ¶ 12.) "At the end of Plaintiff's shift on August 15 and 16, 1994, Defendant stood at the door with his arms folded and glared at the Plaintiff as he left the building." (Compl. ¶ 14.)

(4) On the night of August 17–18, 1994, the alleged assault occurred. When Lee left work early in the morning on August 18, "Pfeifer again was waiting for him at the exit." (Compl. ¶ 23.)

(5) Later that same day, Lee complained of Pfeifer's actions to the Employer Relations Department. (Compl. ¶ 24.) In response, Martin Marietta threatened to take action against Lee for calling security the previous night. (Compl. ¶ 24.)

(6) The next day, August 19, Lee attended a meeting with supervisors of Martin Marietta "who made it clear that they considered Defendant, Pfeifer's actions to be appropriate and that the Plaintiff would be punished for having called security on Defendant, Pfeifer." (Compl. ¶ 25.)

(7) Later that same day, Lee heard that he was going to be fired on Monday, August 22, 1994. (Compl. ¶ 26.) At this point, Lee allegedly succumbed to a nervous breakdown. (Compl. ¶ 27.)

■■■■ Under a *Childers* analysis, accepting Lee's allegations as true, the Court concludes Lee does not state a claim for intentional infliction of emotional distress. To be actionable, the conduct alleged must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Harris*, 380 A.2d at 614 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Although Pfeifer's alleged conduct might be condemned as immature, petty, and unprofessional, it does not rise to the degree of outrageousness necessary to state a claim.[9]

3. *COUNT III: MARTIN MARIETTA'S LIABILITY*

■■■■ Under Maryland law, the doctrine of respondeat superior provides for three theories of employer liability for an employee's torts. "[A] master is liable for the acts

---

8. At the outset it should be noted that Pfeifer denies Lee's factual assertions. (Supplemental Mem. in Opp'n to Mot. to Remand, Ex. B.) The Court will confine its analysis to Lee's version of events and determine whether these incidents, if ultimately proven, state a claim for intentional infliction of emotional distress.

9. As the Maryland Court of Special Appeals stated, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to state a claim. *Id.* Pfeifer's alleged behavior properly falls within this nonac-

tionable category. *See Beye v. Bureau of Nat'l Affairs*, 59 Md.App. 642, 477 A.2d 1197, 1204–05 (holding claim for intentional infliction of emotional distress "woefully inadequate" and "far short of establishing any of the four elements" when plaintiff alleged his supervisors gave him poor performance ratings, " 'threatened to fire him, harassed him and physically assaulted him,' " in addition to passing him over for promotion and deceiving him into resigning), *cert. denied*, 301 Md. 639, 484 A.2d 274 (1984).

which his servant does with the actual or apparent authority of the master, or which the servant does within the scope of his employment, or which the master ratifies with the knowledge of all material facts." *Globe Indem. Co. v. Victill Corp.*, 208 Md. 573, 119 A.2d 423, 427 (1956). The plaintiff's complaint alleges liability under both a "scope of employment" theory and a ratification theory.

■ An employer is vicariously liable for the torts of its employee when the employee committed the tort within the scope of his employment. *See, e.g., Sawyer v. Humphries*, 322 Md. 247, 587 A.2d 467, 470 (1991). In *Sawyer*, the Court of Appeals of Maryland reviewed the law defining "scope of employment" in the context of an assault and battery case. The court summarized: "The general test set forth in numerous Maryland cases for determining if an employee's tortious acts were within the scope of his employment is whether they were in furtherance of the employer's business and were 'authorized' by the employer." *Id.*

■ The court explained that " '[b]y 'authorized' is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the master.' " *Id.* (quoting *Hopkins C. Co. v. Read Drug & C. Co.*, 124 Md. 210, 92 A. 478, 479–80 (1914)). The court framed the essential issue as whether the conduct occurred for personal reasons or for the purpose of furthering the employer's business. Thus, even if the incident occurred at work during normal business hours, a supervisor animated by personal concerns would not be acting within the scope of his employment.[10]

The Court must analyze whether Pfeifer's alleged assault occurred within the scope of his employment with Martin Marietta. The Court holds that it did not.

■ Even under plaintiff's own theory of the case, Pfeifer was acting purely for personal reasons and not in the furtherance of Martin Marietta's business. Lee contends that at the time of the incident, Pfeifer "had absolutely no supervisory responsibility over the Plaintiff." (Compl. ¶ 18.) Furthermore, Pfeifer was not directing Lee to perform a task or otherwise supervising his work.[11] Thus, although the alleged assault occurred on Martin Marietta's property while Pfeifer was working, the incident exceeded the scope of Pfeifer's employment.

■ Lee also claims that Martin Marietta ratified Pfeifer's actions. Even when the agent has no authority, the principal may later ratify his act, "giving it the same effect as if it had been originally authorized." *Citizens Bank of Maryland v. Maryland Indus. Finishing Co.*, 338 Md. 448, 659 A.2d 313, 320 n. 9 (1995) (quoting Restatement (Second) of Agency § 82 (1958)).[12] Ratification is essentially a retroactive approval and can occur only when the master has "knowledge of all material facts." *Globe Indem. Co.*, 119 A.2d at 427.

Martin Marietta did not ratify Pfeifer's alleged assault. Lee brought his claim to the attention of management.[13] He lodged a complaint with the Employer Relations Department of Martin Marietta concerning

**10.** In *Sawyer,* the court stated:

> [P]articularly in cases involving intentional torts committed by an employee, this Court has emphasized that where an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during the normal duty hours and at an authorized locality, the employee's actions are outside the scope of his employment.
>
> 587 A.2d at 471.

**11.** Providing "muscle" was not part of Pfeifer's duties. Thus, this case is distinguishable from "bar bouncer" cases, in which a security guard,

in the normal course of his duties, bodily restrains or removes patrons if necessary. *See, e.g., Market Tavern, Inc. v. Bowen,* 92 Md.App. 622, 610 A.2d 295, 312 (1992), *cert. denied,* 328 Md. 238, 614 A.2d 84 (1992).

**12.** "A principal can ratify an act by 'a manifestation of an election ... to treat the act as authorized' or by conduct that is 'justifiable only if there were such an election.' " *Citizens Bank of Maryland,* 659 A.2d at 320 n. 9 (quoting Restatement (Second) of Agency § 83 (1958)).

**13.** There is no evidence that Lee notified management regarding the alleged electrical cart incident.

Pfeifer's behavior and attended a meeting with various supervisors. (Compl. ¶¶ 24, 25.) Lee's essential complaint, however, is that management did not believe his version of the facts. An employer can only ratify an action if he knows of the material facts concerning that action and specifically approves. That did not occur here.

## B. *PREEMPTION ANALYSIS*

 Because the Court shall dismiss counts II and III of the complaint, the only claim subject to preemption analysis is the claim for assault against Pfeifer (count I). Lee's assault claim does not require interpretation of the collective bargaining agreement and therefore is not preempted by § 301 of the LMRA.

Maryland law defines the tort of assault. Interpretation of the collective bargaining agreement is not required to determine either whether a duty of care exists or to define the nature and scope of that duty.[14] Because an assault is an illegal action, any provision of the contract which purported to give management the right to assault Lee (in the manner complained of by Lee) would be illegal.[15] *Allis–Chalmers Corp.*, 471 U.S. at 212, 105 S.Ct. at 1912 (holding that "§ 301 does not grant the parties to a collective bargaining agreement the ability to contract for what is illegal under state law").

Martin Marietta argues that interpretation of the collective bargaining agreement is required because the agreement allows Martin Marietta control over "the management of plants ... [and] the direction of the working force." (Mem. in Supp. of Defs.' Opp'n to Mot. for Remand, Attach. A at 4.) This argument is flawed. The provision does not,

indeed cannot, establish or define a duty concerning assault of an employee. The provision is irrelevant to the central inquiries under Lee's assault claim.[16]

Finally, the expansive language of the cited provision should not be broadly construed to relate to every interaction between an employer and an employee. "To hold otherwise would mean every tort relating to the work place would be preempted—a result *McCormick* neither supports nor requires." *Jackson*, 992 F.2d at 1326. Therefore, the Court holds that § 301 of the LMRA does not preempt Lee's state claims for assault.

## IV. CONCLUSION

Lee's claim for intentional infliction of emotional distress is meritless, and shall be dismissed with prejudice. Lee's claims against Martin Marietta are likewise legally insufficient, and shall be dismissed with prejudice. Resolution of Lee's claim for assault against Pfeifer does not require interpretation of the collective bargaining agreement, and thus the claim is not preempted by § 301 of the LMRA. This Court does not have jurisdiction over the state law claim Lee asserts, and therefore the Court shall remand the assault claim to the Circuit Court for Baltimore County by separate order.[17]

## *ORDER*

For the reasons stated in a Memorandum of even date, the Court hereby

DISMISSES Count II of the complaint with prejudice;

DISMISSES Count III of the complaint with prejudice;

14. See *McCormick*, 934 F.2d at 536; *Jackson v. Kimel*, 992 F.2d 1318, 1326 (4th Cir.1993) ("If [the defendant] engaged in the actions which [the plaintiff] has alleged, his actions would be wrongful not because of a duty of care created or defined by the terms of the collective bargaining agreement, but because of the principles of state tort law.").

15. Some tort claims are preempted because the collective bargaining agreement arguably allows the employer to take certain actions that might otherwise be tortious. For example, the agreement may permit an employer to search workers

as they leave the plant or to inspect a worker's locker without first securing permission.

16. Proof of assault requires an inquiry into Pfeifer's intent, Lee's apprehension, and what occurred at the confrontation. "Interpretation of the [collective bargaining agreement] can hardly help resolve these factual questions." *Galvez*, 933 F.2d at 778.

17. The disposition of the Motion to Remand precludes this Court from addressing defendants' Cross–Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.

GRANTS IN PART plaintiff's Motion to Remand;

REMANDS Count I of the complaint to the Circuit Court for Baltimore County; and

DIRECTS the Clerk to close the case.

IT IS SO ORDERED.