Naomi L. PERRY

v.

FTDATA, INC.

No. CIV.A. DKC2001–2803.

United States District Court, D. Maryland.

May 8, 2002.

Robert Scott Oswald, Noto and Oswald PC, Washington, DC, for Plaintiff.

Elena D. Marcuss, McGuire Woods LLP, Baltimore, MD, for Defendant.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this sexual harassment case is the motion of Defendant FTData to dismiss Counts I, III, IV, V, VI, and VII of the complaint pursuant to Fed.R.Civ.P. 12(b)(6). The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6. For reasons that follow, the court shall grant the motion as to the second Count III and Counts IV, V and VI. The motion will be denied as to Count VII and denied without prejudice as to Count I.

### I. Background

The following facts are alleged by Plaintiff.

Plaintiff Naomi L. Perry began work as an Administrative Assistant with Defendant FTData, Inc., a Maryland corporation, on March 28, 2000. Perry's duties included administrative and telephone support for FTData's Human Resources Director, Juretta Gonzales, FTData's President, Frank Tyner, and FTData's General Manager, Frank McLallen. Perry alleges that McLallen immediately began a pattern of sexual harassment that continued throughout her employment during which he made clear to her that he was responsible for her job security and advancement possibilities. She also alleges that her rejection of McLarren's advances directly led to her failure to advance and, ultimately, to her termination.

On Perry's first day of work, McLallen took her to lunch, where he recounted to her stories about his sexual exploits and

history and made apparent to her his willingness to engage in extra-marital sexual relationships (McLallen, apparently, was married). On a number of occasions after that lunch, McLallen reminded Perry that he was responsible for hiring and firing decisions and told her that if she desired a promotion to an Executive Assistant position, she needed to be mindful of his "needs." Although Perry was hired to assist a number of employees of FTData, she was directed by McLallen to neglect her other duties should he have something he wanted her to do.

Almost immediately after Perry commenced work at FTData, McLallen would routinely comment on her choice of perfume or clothing either directly or on email, including one occasion in which he commented that a particular blouse "showed off [her] figure." Complaint, at ¶ 8. McLallen began a habit of periodically inviting Perry into his office where he would interject such comments with the door closed.

During one such closed-door conversation, on or about May 2000, McLallen directed Perry to spin around for him and told her that the dress she was wearing was "hot." He commented that he would be in a better mood if she would do that more often. When Perry inquired what McLallen meant by his comment, he replied that she should come in every day and model for him. He also reiterated his position that if Perry would "keep [him] happy" she would not have to worry about job security and that job advancement would be available to her.

In May 2000, McLallen learned that Perry's nickname was "Peaches" and he began to make a point of bringing peaches in his lunch and to make suggestive references to eating peaches. On one occasion, McLallen asked Perry what her "peach" might taste like and invited her to taste his "peach." Perry understood McLallen to

be making references to their respective genitalia. Also in May 2000 and thereafter, McLallen would regularly become visibly irritated with Perry when she failed to respond to his sexually suggestive actions or comments.

In or about June 2000, McLallen directed Perry to delete all emails from him because he feared Tyner would discover them. He created an internet "Hotmail" email account so that he could continue sending suggestive emails to Perry without fear of detection by FTData. In one of these suggestive emails to Perry, he inquired about her sexual experience with other women and related to her a sexually exploit dream he purportedly had in which he had sexual relations with his wife and Perry at the same time.

Near the end of June 2000, McLallen invited Perry to sit behind his desk at his computer with the door closed so that he could show her how to use some software. He was leaning over Perry. When Perry pushed away from the computer to answer the phone, McLallen attempted to raise her skirt and moved as if to kneel before her. At this time, Perry fled this office. After this, McLallen continually cautioned Perry that she was failing to come to his office regularly or meet him out of the office regularly for non-business reasons and that she was not being mindful of his "needs."

On or about Friday, July 14, 2000, McLallen called Perry into his office with the door closed and indicated it would be a disciplinary conversation. McLallen informed Perry that he intended to reprimand her for not making sure he was happy at work and admonished her for not focusing the requisite amount of attention on him. McLallen told her that all she needed to do was to "make [him] happy" and that he would promote her if she would do what was asked of her. At this

point, McLallen stood, unzipped his pants, and revealed his erect penis to Perry, telling her, "if you do me a favor, I'll do you one." He walked around his desk and placed himself between Perry and the door. Perry believed that McLallen would forcibly restrain her. She evaded his advance and fled the office.

For the next several weeks, Perry sought to avoid McLallen and situations where she would be alone with him. On or about August 2000, McLallen requested that Perry come to his office. During this conversation, he apologized for his conduct on July 14 and presented her with four Washington Redskins tickets.

Despite the apology, McLallen's practices of suggesting out-of-office meetings and inviting Perry into his office for non-business reasons continued. McLallen continued to display discontent with Perry's lack of responsiveness to his "needs" and, during one meeting, told her she would not be promoted to Executive Assistant because of her lack of responsiveness. McLallen berated Perry weekly for the next month, informed her she was not a "team player," and told her at one meeting he would be satisfied if she would sit on his lap for a minute each day.

On or about September 8, 2000, McLallen informed Perry that she was in trouble for alleged misuse of an FTData company credit card. He told her that if she had kept him "happy", he could have helped her with this issue, but that, since she had not, it was out of his hands. On or about that same day, McLallen and Gonzalez instructed Perry to report to McLallen's office where they notified Perry of her termination.

After her termination, FTData terminated Perry's health insurance coverage. At no time did FTData provide Perry with notice of her rights under the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161, et seq. ("COBRA") or the Maryland Code Ann., Insurance, § 15–409 (" § 15–409") for the continuation of her health insurance coverage upon her departure from FTData. She incurred costs for medical care, which otherwise would have been covered by her health insurance as provided by FTData.

Perry filed a Charge of Discrimination with the Maryland Commission on Human Relations on November 22, 2000, within 180 days after her termination. This charge was dual filed with the U.S. Equal Employment Opportunity Commission (EEOC). Perry received a Right to Sue letter from the EEOC on May 11, 2001. Subsequently, on July 30, 2001, Perry filed an action in Maryland state court which was removed to this court by FTData on September 20, 2001 pursuant to 28 U.S.C. § 1446. FTData moved to dismiss Count I (Prince George's County Human Rights Act, § 2–222), Count III in part (Maryland Code Ann., Insurance, § 15–409), Count IV (Negligent Hire/Retention), Count V (Assault), Count VI (False Imprisonment), and Count VII (Prostitution/Abusive Discharge).

## II. Standard of Review

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All that the Federal Rules of Civil Procedure require of a complaint is that it contain " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Comet Enters. Ltd. v. Air–A–Plane Corp.*, 128 F.3d 855, 860 (4th Cir.1997). "Given the Federal Rules' sim-

plified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, ——, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002), *quoting Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In reviewing the complaint, the court accepts all well-pled allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir.1997). The court must disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell,* 412 F.2d 712, 715 (4th Cir.1969). The court need not, however, accept unsupported legal conclusions, *Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir.1989), legal conclusions couched as factual allegations, *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir.1979).

III. Analysis

 A. *Exhaustion of administrative remedies (Count I)*

■ Plaintiff attempts to bring a claim in Count I for a violation of § 2–222 of the Prince George's County Code which prohibits employers from making decisions about hiring, termination, or the conditions of employment based on discrimination. FTData contends that Count I should be dismissed for failure to exhaust administrative remedies because Plaintiff never filed a charge with the Prince George's County Human Relations Commission ("PGCHRC"). Plaintiff argues that this failure should be excused because she made a good faith effort to comply with the filing requirements by filing an administrative claim with the Maryland Commission on Human Relations which she allegedly believed would be cross-filed with the PGCHRC.

Prince George's County is authorized to provide a private right of action by Maryland Code, Art. 49B § 42(a). However, the Maryland Code places certain restrictions on when an action may be brought, including a requirement in § 42(c) that an action, "may not be commenced sooner than 45 days after the aggrieved person files a complaint with the county agency responsible for handling violations of the county discrimination laws." It is undisputed that Plaintiff never filed a charge directly with the PGCHRC, the county agency responsible for handling such violations. The claim Plaintiff filed with the Maryland Commission on Human Relations was cross-filed with the EEOC in Baltimore which she allegedly believed would then cross-file it with the PGCHRC pursuant to its designation as a Notice Agency in 29 C.F.R. § 1601.74 and an alleged Work Sharing Agreement between the EEOC and the PGCHRC.

Discovery has not yet commenced. This case will go forward on the merits as to the factually identical Title VII claim, making it premature at this time to resolve whether Plaintiff's purported failure to file a local charge was in good faith. At the dismissal stage, the court does not have before it either the Work Sharing Agreement or a record of attempts at cross-filing the charge. The court can revisit this issue on a motion for summary judgment if it is raised by Defendant. Accordingly, the motion to dismiss will be denied without prejudice as to Count I.

 B. *ERISA Preemption (Count III)*

■ Plaintiff brings two claims captioned Count III, each alleging a violation

based on FTData's alleged termination of Plaintiff's health insurance coverage without giving her proper notice of her rights to continuation of coverage. The first Count III alleges that FTData violated COBRA and the second alleges a violation of § 15–409. FTData argues that the Employment Retirement Income Security Act, 29 U.S.C. § 1001, *et seq* ("ERISA"), of which COBRA is a subsection, preempts Plaintiff's § 15–409 claim and so it should be dismissed. Plaintiff counters that ERISA does not preempt the § 15–409 claim because § 15–409 does not conflict with ERISA and is a law regulating insurance and so exempt from ERISA preemption.

COBRA requires group health plans to provide qualified beneficiaries the opportunity to obtain continuing coverage on the occasion of a qualifying event, such as termination of employment other than for gross misconduct. It also requires that certain notices be given to the employee of her rights to continuing coverage following a qualifying event. 29 U.S.C. §§ 1161–1169. Similarly, § 15–409 is a section of the Maryland Insurance Code requiring group insurance plans to provide continuation coverage in the event of the involuntary termination of employment except for good cause, and requiring employers to notify employees of the availability of continuation coverage.

[3, 4] "ERISA is a 'comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans' by regulating the administration of such plans." Korman v. MAMSI Life & Health Ins. Co., 121 F.Supp.2d 843, 846 (D.Md.2000), *quoting* Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Section 514(a) of ERISA, 29 U.S.C. 1144(a), preempts "any and all State laws insofar as they may now or hereafter relate to any employment benefit plan" cov-

ered by ERISA. Shaw, 463 U.S at 91, 103 S.Ct. 2890. "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Id. at 97, 103 S.Ct. 2890; *see also California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997).

The scope of ERISA's preemption is expansive and "is not limited to 'state laws specifically designed to affect employee benefit plans.'" *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48–49, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), *quoting* Shaw, 463 U.S. at 98, 103 S.Ct. 2890. However, ERISA preemption is not unlimited, as described in *Korman*, 121 F.Supp.2d at 846:

> State claims are allowed to proceed if they "affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." [*Shaw*, 463 U.S.] at 85, 103 S.Ct. 2890. In applying the "relates to" standard, the Fourth Circuit considers whether the claims submitted subjected the employer to "conflicting employer obligations and variable standards of recovery", "determine whether any benefits were paid" or "directly affect the administration of benefits under the plan." *Pizlo v. Bethlehem Steel Corp.*, 884 F.2d 116, 120 (4th Cir.1989)(allowing plaintiffs' state law claims for breach of contract, promissory estoppel, and negligent misrepresentation to survive ERISA preemption).

Plaintiff is correct in her contention that it has not been directly decided that § 15–409 is preempted by ERISA. However, Plaintiff is incorrect in arguing that ERISA should not preempt a § 15–409 claim because the two statutes do not provide conflicting employer obligations. Rather, conflicting obligations are only one

factor looked at in the Fourth Circuit for determining the broader test of whether the statute "relates to" an employment benefit plan. The fact that the Maryland statute, by Plaintiff's own admission, "provides for parallel obligations, liabilities, and standards" as COBRA, Paper no. 13, at 5, supports FTData's contention that § 15–409 "relates to" employee benefits and so should be preempted.

■ Plaintiff contends that § 15–409 is a law regulating insurance and so exempt from ERISA preemption pursuant to 29 U.S.C. § 1144(b)(2)(A)[1] and under *Insurance Commissioner of the State of Maryland v. Metropolitan Life Ins. Co.*, 296 Md. 334, 463 A.2d 793 (1983)(Maryland state law requiring health insurers to provide coverage for treatment of social workers not preempted by ERISA because it was a law affecting types and minimums of coverage and so regulated insurance). The court may consider three criteria when determining whether a law regulates the business of insurance for the purposes of the insurance savings exemption:

> *First,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

*Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647. 129 (1982)(emphasis in original). The provision of the Maryland Insurance Code at issue here involves the obligation of the employer to inform the employee of the availability of continuation health insurance coverage. Section 15–409 does not involve only practices within the insurance industry or an integral part of the policy relationship, but mandates an employer's obligation to its employees. Unlike the law at issue in *Insurance Commissioner,* § 15–409 does not regulate the substance of the insurance coverage, but rather regulates an employee benefit plan by providing the same obligation to employers that COBRA does. Therefore, it is not a law regulating insurance and so is not exempt from ERISA preemption. Accordingly, as § 15–409 "relates to" an employee benefit plan for the purposes of ERISA preemption, the second Count III involving a claim under the Maryland Insurance Code is preempted and will be dismissed.

### C. Negligent Hire/Retention preempted by Title VII (Count IV)

■ Defendant contends that Plaintiff's claim for negligent hire/retention arises out of her allegations of sexual harassment and so are preempted by the Maryland Human Relations Act ("MHRA") and/or Title VII. In contrast, Plaintiff argues that the MHRA and Title VII only preempt negligent supervision and training claims in the context of hostile work environment complaints. In the current case, according to Plaintiff, she does not allege a hostile work environment, but rather that FTData had actual or constructive knowledge of the hazard McLallen posed to female employees which it disregarded by 1) hiring him and placing him in a position where he could cause harm and 2) retaining him in a position where he could cause harm.

■ There is nothing in the caselaw that suggests that Count IV should not be preempted given the facts alleged by Plaintiff. If a count does nothing more than duplicate a count brought under Title VII or the MHRA, then that count should be dismissed. *See Crosten v. Kamauf,* 932 F.Supp. 676, 684 (D.Md.1996)("If [the negligence counts] do no more than attempt to

---

1. ERISA is not to "be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."

impose liability on [the defendant] for its alleged failure to conform to the dictates of Title VII in its effort to prevent sexual harassment, or to properly respond to a report of sexual harassment, these Counts merely restate the claim brought under Title VII in Count II.") The rationale for this preemption is that the statutes are meant to provide remedial measures for violations of the public policy condemning sexual harassment. For the purposes of bringing a negligence claim, whether conduct is reasonable "within the meaning of tort law is not a floating concept but is itself rooted in public policy." *Maxey v. M.H.M. Inc.*, 828 F.Supp. 376, 378 (D.Md. 1993). In *Maxey*, the court held that, in the context of hostile environment sexual harassment, the source of the public policy was the statutory framework provided by Title VII and its state law counterparts. *Id.*

Whatever distinctions Plaintiff seeks to draw between the instant case and the hostile environment context, her allegations regarding McLallen's hiring and retention by FTData in a supervisory position over female employees sounds in the public policy mandate found in Title VII and its state counterparts.[2] As in *Maxey* and *Crosten*, FTData could only be liable for its "failure to conform to the dictates of Title VII in its efforts to prevent sexual harassment." *Crosten*, 932 F.Supp. at 684. Accordingly, then, the negligent hiring/retention claim is merely duplicative and will be dismissed.

---

**2.** Furthermore, none of the facts alleged by Plaintiff even support her characterization of FTData as having knowledge, actual or constructive, of a hazard McLallen would present to female employees either at the time he was hired or the time he was placed in his position of supervisory authority over Plaintiff. All of the facts alleged by Plaintiff deal with McLallen's conduct towards Plaintiff, most of it occurring behind closed-doors. She makes no allegations that the company knew of the conduct, failed to act on knowledge of the

### D. Assault and False Imprisonment Claims (Counts V and VI)

FTData argues that Plaintiff's intentional tort claims in Count V for assault and Count VI for false imprisonment should be dismissed because, according to the facts alleged, McLallen was not acting within the scope of his employment.[3] Plaintiff contends, in contrast, that McLallen was acting in the scope of his employment because he had supervisory authority over Plaintiff, and the authority to alter the terms and conditions of her employment. Because, for reasons stated below, Plaintiff has not adequately alleged that McLallen was acting within the scope of his employment under Maryland law when he committed the alleged tortious acts, Counts V and VI will be dismissed.

"An employer is vicariously liable for the torts of its employee when the employee committed the tort within the scope of his employment." *Lee v. Pfeifer*, 916 F.Supp. 501, 508 (1996), *citing Sawyer v. Humphries*, 322 Md. 247, 587 A.2d 467 (1991)("The general test set forth in numerous Maryland cases for determining if an employee's tortious acts were within the scope of his employment is whether they were in furtherance of the employer's business and were 'authorized' by the employer.") At 322 Md. 247, 587 A.2d 467, 470. When determining whether conduct was in the scope of employment, particularly in cases involving intentional torts committed by an employee, *Sawyer*:

---

conduct, or that there were any prior signs of McLallen's behavior that would give the company constructive knowledge of the risk he presented.

**3.** Plaintiff also contends that Count V should be dismissed because, as an assault claim, it is preempted by the Maryland Worker's Compensation Act. Because McLallen was not acting in the scope of his employment, it is not necessary to reach the preemption question.

framed the essential issue as whether the conduct occurred for personal reasons or for the purpose of furthering the employer's business. Thus, even if the incident occurred at work during normal business hours, a supervisor animated by personal concerns would not be acting within the scope of his employment. *Lee*, 916 F.Supp. at 508; *see also Thomas v. Bet Sound–Stage Restaurant/BrettCo, Inc.*, 61 F.Supp.2d 448, 454 (D.Md.1999)(Applying Maryland law, "the Court finds that an employer cannot be held vicariously liable for sexual assaults committed by its employees or one it may have given apparent authority.")

■ Plaintiff misunderstands the test for scope of employment. In order to determine FTData's liability, the question is whether McLallen, who allegedly committed the tortious acts, did so for FTData's purposes and with the actual or apparent authority of FTData. It is not, as Plaintiff would have it, whether McLallen's alleged tortious acts involved his actual or apparent authority over Plaintiff. While Plaintiff has alleged that McLallen used his supervisory authority over her to attempt to coerce her to engage in sexual activity, she does not allege that he did so in furtherance of FTData's business. Further, contrary to Plaintiff's assertion in her opposition, she does not allege that FTData knew or should have known of the conduct so as to authorize it or that FTData ratified it. In Count IV, Plaintiff does allege that FTData knew or should have known of McLallen's "predilections," but nowhere does she allege facts demonstrating that FTData knew or should have known of McLallen's specific conduct so as

to ratify the intentional torts or somehow authorize them. Plaintiff does not allege that McLallen was acting in the scope of his employment when he allegedly assaulted and falsely imprisoned her. Accordingly, Counts V and VI will be dismissed.

### E. Prostitution/Abusive Discharge (Count VII)

■ FTData contends that Count VII, captioned "Prostitution," should be dismissed because Maryland does not provide a private right of action for prostitution.[4] Plaintiff argues in response that Count VII states a cognizable claim for abusive discharge based on Plaintiff's termination allegedly for rebuffing McLallen's attempts to induce her to engage in conduct amounting to prostitution.

■ However her claim was captioned, Plaintiff clearly intended to bring a claim for abusive discharge. Plaintiff alleged that she was bringing the claim pursuant to *Insignia Residential Corp. v. Ashton*, 359 Md. 560, 755 A.2d 1080 (2000), a case upholding an abusive discharge claim where a plaintiff was terminated for refusing to have sex with her supervisor. Under Maryland law, an at-will employment contract can be terminated by either party at any time. However, a tort cause of action "may lie for the 'abusive discharge' of an at-will employee 'when the motivation for the discharge contravenes some clear mandate of public policy.'" *Insignia*, 359 Md. at 561, 755 A.2d 1080, *quoting Adler v. American Standard Corp.*, 291 Md. 31, 47, 432 A.2d 464 (1981). Actions for abusive discharge are "inherently limited to remedying only those dis-

---

4. FTData also argues that, to the extent that Plaintiff intended to bring an abusive discharge claim, that claim should be dismissed because Plaintiff alleged in her complaint that FTData discharged her for misuse of a company credit card. Plaintiff counters, correctly, that, in contrast to FTData's characteriza-

tion, she alleged in her complaint that, while FTData alleged that she misused a credit card, she was actually terminated for refusing McLallen's advances. Whether FTData's proffered reason is legitimate or pretextual is an evidentiary issue not appropriate for resolution on a motion to dismiss.

charges in violation of a clear mandate of public policy which otherwise would not be vindicated by [its own] civil remedy." *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 605, 561 A.2d 179 (1989). Therefore, in order to state a claim for abusive discharge, Plaintiff must point to a public policy not vindicated by the proscriptions against sexual harassment in Title VII.

 In *Insignia,* the Court of Appeals of Maryland held specifically that a plaintiff was not precluded by *Makovi* from bringing an action for abusive discharge based on the violation of Maryland Code, Art. 27, § 15, which prohibits a person from engaging in prostitution. *See also Watson v. Peoples Security Life Ins. Co.*, 322 Md. 467, 588 A.2d 760 (1991). Plaintiff alleged that McLallen tried to induce her to engage in prostitution in order to state a claim for abusive discharge. Plaintiff's inartful pleading in captioning the count will not result in dismissal where the federal standard is notice pleading, *Karpel v. Inova Health System Servs.*, 134 F.3d 1222, 1227 (4th Cir.1998), and FTData was clearly on notice of an abusive discharge claim, addressing it as such in its motion to dismiss. Accordingly, the motion to dismiss will be denied as to Count VII.

IV. Conclusion

For the foregoing reasons, the court will grant the motion to dismiss as to the second Count III and Counts IV, V and VI. The motion will be denied as to Count VII and denied without prejudice as to Count I. A separate order will be entered.

ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this _____ day of May, 2002, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion of Defendant to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) BE, and the same hereby IS, granted as to the second Count III, and Counts IV, V and VI;

2. The motion of Defendant to dismiss BE, and the same hereby IS, DENIED as to Count VII, and DENIED WITHOUT PREJUDICE as to Count I;

3. The second Count III, and Counts IV, V and VI BE, and the same hereby ARE, DISMISSED;

4. A separate scheduling order will be entered; and

5. The Clerk transmit copies of the Memorandum Opinion and this Order to counsel for the parties.